UNITED STATES of America,
Plaintiff–Appellee,

v.

Dale Roy COMBS, Defendant–
Appellant.

No. 02–50485.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 5, 2004.

Filed Aug. 5, 2004.

Carol K. Lysaght, Santa Monica, CA, for the defendant-appellant.

Debra Yang, United States Attorney, Steven D. Clymer, Special Assistant United States Attorney, Chief of Criminal Division, Cheryl O'Connor Murphy, Assistant United States Attorney, Narcotics Section, Los Angeles, CA, for the plaintiff-appellee.

Before: REINHARDT, THOMPSON, and KIM WARDLAW, Circuit Judges.

WARDLAW, Circuit Judge:

Dale Roy Combs appeals from the district court's judgment of conviction and sentence imposed after a jury found him guilty as charged in a two-count indictment for manufacturing and distributing more than 500 grams of a mixture or substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. § 841(a)(1). Because we conclude that the transfer of trace, unuseable amounts of methamphetamine for the purpose of disposal is insufficient to support a conviction for "distribution" under Section 841(a)(1), and that improper prosecutorial questioning and vouching prejudiced Combs's right to a fair trial, we reverse, vacate, and remand for a new trial on solely the manufacturing count.

## I

### Background

Combs owned an automotive machine shop occupying Bay 22 in an industrial

compound in Lancaster, California. In late 1998, his brother, David, a worker at the shop, was arrested, convicted, and imprisoned for manufacturing methamphetamine. Earl Floyd performed odd jobs for Combs. In May 2000, Floyd was arrested for possession of crack cocaine. Angered because Combs refused to post bail for him, and in exchange for release on his own recognizance, Floyd offered to inform on Combs. The Drug Enforcement Administration ("DEA") enlisted Floyd to work as an informant upon Combs in a drug investigation.

Early in the summer of 2000, Floyd sold Combs two 55–gallon barrels, each half-full of oil, that he had hauled away from an automotive wholesale company. Combs kept the barrels at his machine shop. On August 2, 2000, Floyd drove his truck, which police had searched and equipped with a hidden recording device, to Combs's shop, where Combs offered Floyd $100 to haul away the two barrels, which were now completely full of oil and "some other things." Combs was recorded instructing Floyd to wipe the barrels clean of fingerprints before disposing of them. Floyd loaded the barrels onto his truck and delivered them to law enforcement officials. An inspection team took numerous samples of the multi-layered liquid from various parts of the barrels; chemical analysis of these samples revealed trace amounts of methamphetamine in the first barrel and no methamphetamine in the second barrel. The first barrel also contained several objects consistent with the manufacture of methamphetamine, including plastic tubing and broken glassware. The inspection team did not preserve this evidence for trial. Kent Bailey, the DEA special agent leading the Combs investigation, was present during this inspection.

Although the transfer of the barrels to Floyd on August 2, 2000 would become the basis for the two-count indictment, Combs was not arrested until more than one year later, on August 21, 2001. The agents who searched Combs's machine shop found no evidence of methamphetamine possession or manufacture. Combs believed he had been arrested for illegally dumping oil.

Combs was taken to Kern County Jail where he was confined in a holding cell from August 22 to August 30 with Robert Williams, also arrested August 21. Williams later entered into a plea agreement that required him to testify at Combs's trial in exchange for possible leniency in his own unrelated methamphetamine case, carrying a minimum 10 years to life possible sentence. Williams testified that Combs told him many details of his case, including that he hired a black man to haul away barrels, one of which contained "a hose and some waste from a prior methamphetamine cook." Williams also asserted that Combs said he manufactured methamphetamine, sometimes cooked 15 pounds of methamphetamine in a week, and his brother David would take responsibility for the barrels if necessary. At trial, Combs testified that he never spoke directly with Williams.

Combs agreed to discuss the case with agent Bailey and his fellow agent Mark Cory. It is undisputed that Combs admitted the following facts during their unrecorded post-arrest interview: (1) he paid Floyd to haul away the two 55–gallon barrels on August 2, 2000; (2) he knew one of the barrels contained a mixture of oil and methamphetamine waste; (3) he told Floyd to wipe the barrels clean of fingerprints; (4) he previously had paid Floyd to dispose of a cardboard box that he believed contained methamphetamine waste materials; (5) he has purchased hypophosphorous acid; (6) he knew a person who sold pseudoephedrine, and he could buy pseudoephedrine from this source; (7) he

heard rumors about a surveillance camera monitoring his business; and (8) he knew technical specifications about aspects of the methamphetamine manufacturing process. Combs was then charged with manufacturing and distributing more than 500 grams of a substance containing methamphetamine on or about August 2, 2000, and the case went to trial.

Agent Bailey testified that Combs admitted to manufacturing methamphetamine. Combs last manufactured the drug at his machine shop in early August 2001, approximately two weeks before his arrest. Agent Cory had not been present when Combs made these admissions to agent Bailey; Combs testified at trial that he did not make them.

Combs testified that his brother David had been previously convicted and imprisoned on methamphetamine manufacturing charges, and that the drug-related waste materials in the barrel and cardboard box came from David's methamphetamine laboratory. After David's arrest, Combs sent employees to David's home to bring back to the machine shop various methamphetamine-related materials, which sat in the barrel and box for several years until Combs paid Floyd to get rid of them. Combs admitted discussing technicalities of methamphetamine manufacture with agent Bailey, but testified that he had only heard or read about such methods in books or on the Internet, and that he only became interested in the subject after David's arrest. Combs testified that he had never manufactured methamphetamine, and had never used illegal drugs.

During Combs's cross-examination by the AUSA, the district court judge intervened:

[AUSA:]

Q: You told Special Agents Bailey and Cory that you last manufactured methamphetamine on or about August 5; isn't that correct?

A: I did not.

Q: So Special Agent Bailey is making that up?

A: I told you what happened. He said. I didn't say. He answered. I ended the interview.

Q: So you are saying that Special Agent Bailey is lying in his testimony?

A: Yes. Detective Cory was not in the room at this time.

Q: That wasn't my question. My question was are you saying that Special Agent Bailey was lying when he testified earlier?

A: I am saying what is written on that paper is not what I said.

THE COURT: Don't worry about what is written on the paper. We are not interested in that. She is asking you about Agent Bailey's testimony on the subject.

A: His testimony is—I never heard it until the other day.

THE COURT: Well, that's what she's asking you about.

A: Yes, I would say that he lied.

The prosecutor argued in closing:

The defendant claims Special Agent Bailey is lying. Ask yourselves, ladies and gentlemen, who has the motive to lie here, the defendant or Special Agent Bailey—Special Agent Bailey will get up and go to work on Monday as he has done for the past ten years regardless of the outcome of this case—or the defendant who is facing two felony charges?

Combs's counsel argued in response:

[Law enforcement officials] believed at that time [i.e., August 21, 2001] that they were going to find a clandestine methamphetamine lab in [Combs's machine shop], and when they didn't they

were—they had to have tombstones in their eyes, tomb-stones in their eyes.

. . . .

The agents here, their job isn't on the line. No, they aren't going to get fired. You don't get terminated, but you don't keep getting promotions when you go into homes or business establishments after an 18–month investigation and you find nothing. That's not the way to make friends and influence your superiors in the private sector or the government sector.

The prosecutor argued in rebuttal:

Most of all, ladies and gentlemen, you have to believe that Special Agent Kent Bailey is a liar. If you believe the defendant's version of events, you have to believe that Special Agent Kent Bailey walked up to that witness stand, swore to tell you the truth, and perjured himself.

You have to believe that Special Agent Kent Bailey flushed his ten-year career down the toilet. For what? For a nice old grandfatherly man? Why would he do that? That makes no sense. Special Agent Bailey may not get fired for participating in a search warrant where there was no meth lab, but you can be darn sure he would get fired for perjuring himself.

Combs's counsel did not object either to the questioning or closing argument regarding Agent Bailey's truthfulness. Nor did the court instruct the jury as to consideration of either the testimony or argument.

On April 12, 2002, after deliberating for half a day, the jury sent out a note stating that it was unable to reach a verdict on the manufacturing count. After further deliberation, on April 15, 2002, the jury returned a special verdict finding Combs guilty on both counts of the indictment. The district court denied Combs's motions for acquittal and for a new trial. Following sentencing, Combs timely appealed.

## II

### Standard of Review

■■■ Where, as here, the defendant preserves his claim of insufficient evidence by making a motion for acquittal at the close of the evidence, we review the district court's denial of the motion *de novo*. *United States v. Carranza*, 289 F.3d 634, 641 (9th Cir.2002). "A challenge to the sufficiency of the evidence requires this court to determine if, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *Id.* at 641–42 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).

■■■ Because Combs failed to object to the prosecution's improper cross-examination and vouching, we review his claims on appeal for plain error. *United States v. Geston*, 299 F.3d 1130, 1134 (9th Cir.2002) (improper cross-examination); *United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir.1993) (vouching). "To secure reversal under this standard, [the defendant] must prove that: (1) there was 'error'; (2) the error was plain; and (3) the error affected 'substantial rights.' " *Geston*, 299 F.3d at 1134–35(quoting *United States v. Sanchez*, 176 F.3d 1214, 1219 (9th Cir. 1999); *United States v. Turman*, 122 F.3d 1167, 1170(9th Cir.1997)). Reversal is proper "only if, viewed in the context of the entire trial, the impropriety seriously affected the fairness, integrity, or public reputation of judicial proceedings, or where failing to reverse a conviction would result in a miscarriage of justice." *Geston*, 299 F.3d at 1135(quoting *United States v.*

*Tanh Huu Lam,* 251 F.3d 852, 861 (9th Cir.2001)).

## III

## Distribution

It is undisputed that Combs transferred waste material containing trace amounts of unuseable methamphetamine to Floyd for the sole purpose of disposal. This transfer is the only basis for Combs's distribution conviction. The government asserts that this evidence sufficiently supports the "distribution" count, contending that Section 841(a)(1) "criminalizes any delivery of a substance containing a detectable amount of methamphetamine, regardless of the purpose for [the transfer]." We think that this reading of Section 841(a)(1) is technical to the point of absurdity.

Section 841(a)(1) makes it "unlawful for any person knowingly or intentionally to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance...." For purposes of Section 841(a)(1), "distribute" means "to deliver (other than by administering or dispensing) a controlled substance or a listed chemical"; "deliver" means "the actual, constructive, or attempted transfer of a controlled substance or a listed chemical, whether or not there exists an agency relationship." 21 U.S.C. § 802(11); *id.* § 802(8).

■ Thus, a literal reading of the statute encompasses Combs's knowing delivery to Floyd of the barrel containing trace, although unuseable, amounts of methamphetamine. But we are not required to interpret a statute in a formalistic manner when such an interpretation would produce a result contrary to the statute's purpose or lead to unreasonable results.

*See, e.g., Comm'r v. Brown,* 380 U.S. 563, 571, 85 S.Ct. 1162, 14 L.Ed.2d 75 (1965) ("Unquestionably the courts, in interpreting a statute, have some scope for adopting a restricted rather than a literal or usual meaning of its words where acceptance of that meaning would lead to absurd results or would thwart the obvious purpose of the statute.") (internal quotation marks and citations omitted); *United States v. Daas,* 198 F.3d 1167, 1174 (9th Cir.1999) (Court may look beyond plain language of statute if its application would lead to "unreasonable or impracticable results."). Indeed, under similar circumstances, we have construed "distribution" under 21 U.S.C. § 841(a)(1) to exclude mere disposal of manufacturing waste containing trace quantities of methamphetamine. *See United States v. Sitton,* 968 F.2d 947, 959 (9th Cir.1992), *abrogated on other grounds by Koon v. United States,* 518 U.S. 81, 96–100, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996); *see also United States v. Terry,* 11 F.3d 110, 114 (9th Cir.1993).

In *Sitton,* police found a drum containing 4.5 gallons of liquid waste in defendants' self-storage unit that later tested positive for trace amounts of methamphetamine. Defendants were convicted of possession with intent to distribute the drug. On appeal, they argued that the district court should have instructed the jury on the lesser included offense of simple possession because the jury could have rationally concluded that defendants possessed the liquid mixture but intended "to dispose of it rather than to distribute it." *Sitton,* 968 F.2d at 959. We agreed:

> Where there are large quantities of a drug and other evidence tending to establish distribution, [this court has] declined to require a possession instruction.... Under such circumstances, no rational jury could conclude that the defendant possessed the drug without also concluding that he intended to distribute it. However, in this case a rational jury

could have believed that the mixture contained only traces of methamphetamine and that it was waste from the manufacturing process that defendants did not intend to repurify.

*Id.* (internal quotation marks and citations omitted, alteration in original). Accordingly, we reversed defendants' distribution convictions because the jury was not instructed on the lesser possession offense.

We again recognized the disposal/distribution distinction in *Terry*, 11 F.3d at 113–14. Terry was arrested in possession of several jugs of liquid containing methamphetamine, and convicted of possession with intent to distribute the drug. He moved for a judgment of acquittal on the ground that the methamphetamine was suspended in a toxic liquid, and thus "not far enough along in the refining process to be distributable." *Id.* at 113. Relying on *Sitton*, Terry argued that he had only transported the liquid "in an effort to 'save' it, as the reaction process had 'gone bad,' and that, in the event he was unable to retrieve the methamphetamine, the liquid would have been discarded as waste." *Id.* at 114. We rejected this theory, agreeing with the government's view that *Sitton* was factually distinguishable:

> In *Sitton*, the defendants argued if they possessed the mixture, "they did so with intent to dispose of it rather than to distribute it." 968 F.2d at 959. Terry concedes the seized liquid was in the beginning stage of *manufacture* and that he was transporting it with the intent to see if he could *retrieve*, not discard, the methamphetamine contained in it. Only if that failed, would Terry have disposed of the liquid. As

such, the situation in this case is distinguishable from that in *Sitton*.

*Id.*

■ Although the charged offense here (actual distribution) differs from the offense in *Sitton* and *Terry* (possession with intent to distribute), the legal issue is identical: whether disposal of methamphetamine waste is a "distribution" under Section 841(a)(1). In *Sitton*, we said it was not, holding that a rational jury could have acquitted on the intent-to-distribute charge if it believed the defendants intended only to dispose of the methamphetamine waste rather than to distribute it. We did not disturb this analysis in *Terry*; rather, we noted that the defendant did not actually intend to dispose of the methamphetamine mixture, distinguishing *Sitton's* holding. We therefore conclude that the evidence that Combs intended to and did dispose of methamphetamine waste, viewed in the light most favorable to the government, is insufficient to establish "distribution" of methamphetamine under Section 841(a)(1).[1]

This holding is consistent with the recognized purpose of the drug statute and its penalty scheme. In *Chapman v. United States*, 500 U.S. 453, 461, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991), the Supreme Court explained:

> Congress adopted a "market-oriented" approach to punishing drug trafficking, under which the total quantity of what is distributed, rather than the amount of pure drug involved, is used to determine the length of the sentence [for a violation of 21 U.S.C. § 841(a)].... It intended the penalties for drug trafficking to be graduated according to the weight of the drugs in whatever form they were

---

1. Because we reverse the district court's denial of Combs's motion for acquittal for insufficient evidence, we need not reach his alternative argument that the district court plainly erred by failing to instruct the jury *sua sponte* that simple possession is a lesser included offense of distribution.

found—cut or uncut, pure or impure, ready for wholesale or ready for distribution at the retail level. Congress did not want to punish retail traffickers less severely, even though they deal in smaller quantities of the pure drug, because such traffickers keep the street markets going.

*Id.* (quoting H.R.Rep.·No. 99–845, pt.1, at 11–12, 17 (1986)). We have noted that the statute is aimed at the trafficking of controlled substances "through the chain of distribution," and its punishment scheme is "intended to institute a hierarchy of sentencing based upon [the defendant's] position in the manufacturing and distribution chain." *United States v. Chan Yu–Chong,* 920 F.2d 594, 597 (9th Cir.1990) (citing H.R.Rep. No. 99–845, pt. 1, at 11–12 (1986)); *see also United States v. Savinovich,* 845 F.2d 834, 839 (9th Cir.1988) (The statute's punishment scheme reflects "Congress' desire to prevent both wholesale and retail distribution of illegal drugs."). Consistent with this market-oriented approach, "[p]urity is not the focal point of culpability; rather, Congress was concerned with the amount of consumable drugs on the market, whether pure or impure." *United States v. Acosta,* 963 F.2d 551, 554 (2d Cir.1992); *see also United States v. Coleman,* 166 F.3d 428, 431–32 (2d Cir.1999) ("Function, not form, is critical. Congress [in enacting § 841] was concerned with mixtures that will eventually reach the streets, i.e., consumable mixtures.") (quoting *Acosta,* 963 F.2d at 554) (alteration in original). A "distribution" conviction for Combs's disposal of methamphetamine waste does not serve any of these purposes because he did not traffic consumable drugs within the distribution chain or affect wholesale or retail drug markets.

The government insists that a transfer of any "detectable" amount of methamphetamine supports a distribution charge simply because such an amount may be relevant to sentencing. *See* 21 U.S.C. § 841(b)(1)(A)(viii) (describing statutory minimum sentence for distribution of "500 grams or more of a mixture or substance containing a detectable amount of methamphetamine"). The government has not identified and we have not found any case that supports this theory of guilt, however, which flies in the face of the precedents discussed above. *Cf. United States v. Campbell,* 61 F.3d 976, 980 (1st Cir.1995) (affirming conviction for manufacturing and distributing a very small but useable quantity of a controlled precursor chemical, but leaving open the question whether a trace, unuseable amount could suffice for a conviction under 21 U.S.C. § 841(a)(1)). In any event, while some mixtures containing a "detectable" amount of methamphetamine may be relevant to sentencing, it is well established that methamphetamine waste water is irrelevant to sentencing. *See United States v. Sprague,* 135 F.3d 1301, 1305 (9th Cir.1998) ("[T]he weight of waste washings in a mixture containing only trace amounts of a controlled substance would be excluded for purposes of base offense level calculation to the extent that it is material that must be separated from the controlled substance to render it useable.") (discussing U.S.S.G. § 2D1.1, cmt. 1). That a person may be sentenced for distribution of a substance containing a detectable amount of methamphetamine is of no relevance here.

Finally, we note that adopting the government's position would lead to unintended, absurd results. For example, a citizen who discovers unuseable drug-manufacturing waste dumped on his property and knowingly gives that material to his garbage collector for disposal would face prosecution for distribution of a controlled substance. Any end-user who throws away the unuseable waste portion of his drug

could be found guilty of distribution, instead of simple possession. Because we do not believe that Congress intended to punish these individuals as drug traffickers, we decline to read Section 841(a)(1) as proscribing the transfer of detectable but unuseable trace amounts of methamphetamine contained in waste material for the purpose of disposal.

# IV

## Prosecutorial Misconduct

■■■ The government concedes that it was improper for the prosecutor to question Combs about whether special agent Bailey was lying. *See United States v. Sanchez,* 176 F.3d 1214, 1219 (9th Cir. 1999) (holding it is error "for a prosecutor to force a defendant to call a [testifying government agent] a liar"); *Geston,* 299 F.3d at 1136–37. Because we conclude that this error was plain, was compounded by impermissible vouching during closing argument, affected Combs's substantial rights, and seriously affected the fairness and integrity of his trial, we must also reverse Combs's conviction for manufacturing methamphetamine.

## A

## Improper Cross-examination

In denying Combs's motion for a new trial, the district court recognized the obvious error but ruled that it "did not materially affect the verdict." We disagree, and conclude further that the improper questioning and compelled responses, in which the judge participated, affected Combs's "substantial rights" and "seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Geston,* 299 F.3d at 1135.

We disagree with the government's view that the evidence of Combs's guilt was overwhelming. There was in fact *no* direct evidence supporting Combs's manufacturing conviction. In its 18–month investigation, the government failed to identify any witness who had ever seen Combs manufacture drugs or observed a methamphetamine lab on his premises. Even the informant Floyd, who had ongoing access to Combs and the machine shop, testified that he never saw Combs manufacture or sell methamphetamine, never saw a laboratory at the shop, and never learned of a single incident of manufacture. Moreover, the government's search of Combs's machine shop uncovered no drugs, ledger books, cash, manufacturing materials or equipment.

Nor was the circumstantial evidence of the charged offense particularly "strong." Much of it was equally consistent with Combs's defense. This evidence included the transfer to Floyd of the barrel containing oil and methamphetamine waste; the testimony of an expert chemist that the amount of waste product in the barrel was consistent with the manufacture of more than 500 grams of methamphetamine; Williams's testimony that Combs said the barrel contained waste from a "prior methamphetamine cook"; and Combs's admissions that he could procure precursor chemicals and was knowledgeable about methamphetamine manufacture. Combs had also testified that he believed he had been arrested for illegal dumping; that he was merely trying to dispose of waste material left over from his brother David's methamphetamine manufacturing activities; and that he gained knowledge of drug manufacturing after his brother's arrest. Evidence of other acts, such as Combs's transfer to Floyd of the cardboard box containing methamphetamine-related items, was introduced only to establish knowledge and lack of mistake, and the district court instructed the jury that Combs was on trial only in connection with

the contents of the barrel transferred to Floyd on August 2, 2000. In addition, evidence that Combs later negotiated with Floyd to buy hypophosphorous acid, a precursor chemical in the manufacture of methamphetamine, was explained by the fact that Combs used the chemical as a rust inhibitor in his machine shop. Moreover, although a hazardous materials team inspector testified that David's house had been swept clean of methamphetamine-related items after his arrest, the inspector could not recall any details about the house or identify with any specificity anything removed from the house.

Only two pieces of evidence supported the notion that Combs ever manufactured methamphetamine at all: (1) the testimony of cellmate Williams, and (2) the testimony of agent Bailey that Combs had "last manufactured" methamphetamine approximately two weeks before his arrest on August 21, 2001.[2] The former testimony was given by a convicted felon, whose testimony the court instructed the jury to view with special caution in light of his agreement with the government to provide testimony against Combs in exchange for possible leniency in his case. By comparison, and underscoring the importance of the evidence to the government's case, the latter testimony was given by the lead DEA agent, Bailey, who sat at counsel table throughout the entire trial.

Because there was no direct evidence of guilt and the circumstantial evidence was not overwhelming, the case boiled down to whether the jury believed Combs when he testified that he had not manufactured methamphetamine. Because "witness

credibility was paramount," *Geston,* 299 F.3d at 1137, agent Bailey's testimony was critical, and possibly determinative. It was therefore fundamentally unfair to compel Combs to impugn the veracity of agent Bailey's testimony, pitting Combs's credibility against agent Bailey's. Coercing Combs to call the lead investigating officer in his case a liar was even more prejudicial than the error in *Geston,* where we found reversible error based upon the prosecution's improper cross-examination of non-defendant government agents concerning the veracity of other agents' testimony.

We reject the government's assertion that this error was not prejudicial because the improper questioning involved merely a "collateral subject matter," i.e., whether Combs admitted to manufacturing methamphetamine on August 5, 2001, as opposed to the date charged in the indictment. The jury was not so instructed. Because the dates are so similar, it would prejudice Combs's right to a fair trial to assume the jury made this fine distinction on its own. Furthermore, even if the jury had been instructed on the significance of the different dates, testimony on this "collateral subject matter" would still have had prejudicial effects because it would have suggested to the jury that Combs had a propensity to engage in the charged crime.

The prejudicial effect of the improper questioning was compounded when the district judge placed upon it her imprimatur. She twice chastised Combs on the stand and instructed him to answer the prosecution's question about the truthfulness of

---

**2.** Although Williams and agent Bailey testified that Combs admitted to manufacturing methamphetamine, their testimony is not direct evidence that Combs manufactured methamphetamine "on or about August 2, 2000," as charged in the indictment. Williams testified that Combs admitted to manufacturing "in

the past" for "Dale High prior to [High's] leaving for Ohio," with no further indication when this manufacturing took place. Agent Bailey's testimony was that Combs admitted to manufacturing on August 5, 2001—a full year after the date charged.

agent Bailey's trial testimony. Neither *Sanchez* nor *Geston* involved the district court's legally erroneous and prejudicial orders to the defendant to answer the improper questions. We cannot presume that the jury either did not notice the district court's reprimand or that it did not affect the verdict because the jury comprehended that the district judge was insisting that Combs answer questions that were merely collateral, as the government contends.

Nor was the improper questioning an "isolated incident." Unlike in *Sanchez* and *Geston*, the prosecutor revived the error in her closing argument by explicitly referencing the prejudicial testimony. By re-emphasizing this testimony immediately before the jury entered deliberations, the prosecutor herself destroyed any chance that the jury forgot about the error or viewed it as an unimportant, isolated incident.

Thus, we find the improper cross-examination of Combs to be more egregious and prejudicial than that in *Geston*, where we found that error alone required reversal.

**B**

**Vouching**

■ Unlike in *Geston*, the prosecutor compounded the improper cross-examination by arguing that in order to acquit Combs, the jury had to believe that agent Bailey risked losing his job by lying on the stand. This was impermissible vouching. *See Sanchez*, 176 F.3d at 1224 ("It is improper vouching for the prosecutor to offer personal assurances of the veracity of government witnesses or to suggest their testimony is supported by information not introduced as evidence.") (citing *United States v. Molina*, 934 F.2d 1440, 1445 (9th Cir.1991)). The error further compromised Combs's due process rights

and the integrity of his trial. *See id.* at 1225(reversing conviction based upon the cumulative effect of, among other errors, improper cross-examination of defendant and impermissible vouching for government witness in closing argument); *United States v. Richter*, 826 F.2d 206, 208–09 (2d Cir.1987) (reversible error where prosecutor forced defendant to testify that government agent's testimony was not true, then vouched for agent's truthfulness in closing argument).

■ The government concedes that in hindsight it would not have argued Bailey's disincentive to lie, but contends that the vouching was invited by defense counsel's closing argument, and therefore excusable. We disagree. It is well settled that "the prosecution is not allowed to use improper tactics even in response to similar tactics by the defense." *United States v. Sarkisian*, 197 F.3d 966, 990 (9th Cir.1999) (finding improper vouching, but harmless error). But in fact, it was the prosecutor, not defense counsel, who initiated the argument about agent Bailey's veracity. After reminding the jury that Combs had called agent Bailey a liar, the prosecutor asked the jury "who has the motive to lie here, the defendant or Special Agent Bailey?" In response, defense counsel argued that agent Bailey may have been under pressure because the search of Combs's machine shop had uncovered no evidence of a clandestine methamphetamine laboratory. This was an appropriate response to the prosecutor's statement that agent Bailey had no motivation to lie. It was neither an invitation nor justification for the prosecutor's improper rebuttal based upon matters outside the record. *See United States v. Boyd*, 54 F.3d 868, 871–72 (D.C.Cir.1995) (clear error for prosecutor to vouch for police witnesses' credibility by arguing that they would not lie on the stand and thereby jeopardize their careers

and risk criminal prosecution) (collecting numerous cases). Thus, we conclude that the prosecutor's rebuttal argument was not "invited," and it did more than simply "right the scale." *United States v. Young,* 470 U.S. 1, 12–13, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985).

We are not persuaded that the prejudice from the prosecutor's vouching was "neutralized," as the government suggests, by the district court's general instructions to the jury. The instructions did not specifically address the improper vouching; rather, the district court issued the standard jury instructions, including that the statements and arguments of counsel were not evidence; that the jury was to decide the case solely on the evidence introduced at trial; and that it was within the jury's province to make credibility determinations. In *Necoechea,* where we held the prosecutor's improper vouching in closing argument was not reversible error, we found these general instructions sufficient because the witness's credibility had also been "forcefully challenged at trial" through the introduction of her plea agreement, and there was "significant circumstantial evidence" connecting the defendant with the charged crime. 986 F.2d at 1280–81. Here, by comparison, there was no such "forceful challenge" of agent Bailey's credibility and the circumstantial evidence against Combs was not strong. Thus, we cannot say that the standard instructions together with the weight of the evidence cured the damage from the improper vouching. The district court should have given a more specifically tailored curative instruction. *See United States v. Kerr,* 981 F.2d 1050, 1054 (9th Cir.1992) (reversing for plain error because case was close, witness credibility was critical, and the district court's general instruction "did not mention the specific [vouching] statements of the prosecutor and was not given immediately after the

[vouching occurred]"); *United States v. Simtob,* 901 F.2d 799, 805 (9th Cir.1990) (reversing under harmless error review because the effect of vouching was not cured even though the district court directed the jury to disregard the prosecutor's comments and later instructed the jury that "the prosecutor cannot vouch for the truthfulness of a witness").

 We have not adopted a bright-line rule that establishes when vouching requires reversal. *Necoechea,* 986 F.2d at 1278. Instead, we consider a number of factors, including:

> the form of vouching; how much the vouching implies that the prosecutor has extra-record knowledge of or the capacity to monitor the witness's truthfulness; any inference that the court is monitoring the witness's veracity; the degree of personal opinion asserted; the timing of the vouching; the extent to which the witness's credibility was attacked; the specificity and timing of a curative instruction; the importance of the witness's testimony and the vouching to the case overall. When reviewing for plain error, we then balance the seriousness of the vouching against the strength of the curative instruction and closeness of the case.

*Id.*

Many of these factors weigh in favor of a finding that the prosecutor's vouching alone is plain error requiring reversal. Although the prosecutor may not have vouched for agent Bailey on a personal level, she plainly implied that she knew agent Bailey would be fired for committing perjury and that she believed no reasonable agent in his shoes would take such a risk. The jury could easily have inferred that the district court was monitoring agent Bailey's veracity in light of its role in reprimanding Combs and requiring him to

testify that agent Bailey was a liar. The district court's failure to instruct the jury specifically with respect to the vouching would only have reinforced that prejudicial inference. Moreover, agent Bailey's credibility was critical to the government's case, as there was no direct evidence linking Combs to the charge of manufacturing methamphetamine.

Finally, weighing the seriousness of the vouching against the strength of the curative instruction and weak circumstantial nature of the government's case, we are compelled to conclude that the balance tips in Combs's favor. As we have previously noted, "[v]ouching is especially problematic in cases where the credibility of the witnesses is crucial." *Necoechea*, 986 F.2d at 1276 (quoting *Molina*, 934 F.2d at 1445). It was even more problematic in this case due to the prosecutor's improper cross-examination of Combs. Moreover, the general curative instructions did not address the vouching. We conclude that the prosecutor's improper vouching for agent Bailey's credibility prejudiced Combs's due process rights and the integrity of his trial.

### C

### Effect of Prosecutorial Misconduct

Either the improper questioning in which the district court participated or the improper vouching standing alone would require reversal in this close case. Viewed in the context of the entire trial, each of these errors prejudiced Combs's "substantial rights" and "seriously affected the fairness, integrity, or public reputation of" his trial. *Geston*, 299 F.3d at 1135. Thus, we reverse, vacate the sentence, and remand

for a new trial on the charge of manufacturing in violation of 21 U.S.C. § 841(a)(1).[3]

**REVERSED, VACATED, and REMANDED.**

---

3. Because we hold that prosecutorial misconduct rendered Combs's manufacturing conviction invalid, we need not reach his alternative arguments that (1) there was insufficient evidence to prove that he manufactured in excess of 500 grams of a mixture containing methamphetamine; and (2) the district court plainly erred by admitting the government's expert opinion testimony about the quantity of methamphetamine manufactured because the factual basis of the expert's opinion was erroneous.