# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

            v.

DEVAUGHN DORSEY, also known as
Buster,
            *Defendant-Appellant.*

No. 10-30278

D.C. No.
2:08-cr-00245-
RSL-1

OPINION

Appeal from the United States District Court
for the Western District of Washington
Robert S. Lasnik, District Judge, Presiding

Argued and Submitted
February 9, 2012—Seattle, Washington

Filed April 30, 2012

Before: Mary M. Schroeder and Ronald M. Gould,
Circuit Judges, and Ralph R. Beistline,
Chief District Judge.*

Opinion by Judge Gould

---

*The Honorable Ralph R. Beistline, Chief District Judge for the District
of Alaska, sitting by designation.

**COUNSEL**

Sheryl Gordon McCloud (argued), Law Offices of Sheryl Gordon McCloud, Seattle, Washington, for the defendant-appellant.

Jill A. Otake (argued) and Helen J. Brunner, United States Attorney's Office, Seattle, Washington, for plaintiff-appellee.

**OPINION**

GOULD, Circuit Judge:

Devaughn Dorsey pleaded guilty to one count of conspiracy to traffic in motor vehicles or motor vehicle parts in violation of 18 U.S.C. § 371, two counts of operating a chop shop in violation of 18 U.S.C. § 2322(a)(1) and (b), and seventeen counts of trafficking in motor vehicles in violation of 18 U.S.C. § 2321(a). A jury then convicted Dorsey of two related crimes: one count of witness tampering in violation of 18 U.S.C. § 1512(a)(1)(A), (1)(C), (2)(A), and (2)(C), and one count of discharging a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A). Dorsey now appeals from the judgment and sentence imposed on all counts. We have jurisdiction under 28 U.S.C. § 1291. We affirm.

**I**

**A**

Between July of 2007 and May of 2008, Dorsey led a conspiracy to traffic in stolen motor vehicles. To steal motor vehicles, Dorsey and his co-conspirators did "key switches" at auto dealerships. Members of the conspiracy would ask an auto salesperson to start a vehicle. One person would distract

the salesperson while another would switch the key in the vehicle with a key from a similar vehicle. The members would later return to the dealership and use the real key to drive the vehicle off the lot. After stealing vehicles, Dorsey and his co-conspirators removed their vehicle identification numbers ("VIN") and replaced them with other VINs gained from wrecking yards. They then registered the stolen vehicles with the Washington Department of Licensing using fraudulent documents, and finally either sold for profit or abandoned the vehicles.

As part of this conspiracy, Dorsey enlisted Martine Fullard to help falsely register a stolen Buick LaCrosse. At Dorsey's direction, Fullard registered the LaCrosse in her name at the Department of Motor Vehicles. Dorsey gave Fullard about $200 and told her the car would be registered in her name no longer than two weeks. Fullard saw the LaCrosse only once.

In January of 2008, Seattle police began an investigation of the vehicle-trafficking conspiracy. Dorsey learned of the investigation, and sometime after Fullard registered the LaCrosse in her name, Dorsey called Fullard and told her that the police would probably contact her. The police in fact interviewed Fullard in March of 2008. On May 7, 2008, Fullard was served with a grand jury subpoena in connection with the vehicle-trafficking investigation. She was scheduled to appear before the grand jury on May 15, 2008.

Dorsey knew that Fullard had been served with a grand jury subpoena. A few days before Fullard's scheduled grand jury appearance, Dorsey told William Fomby that Fullard was going to testify before the grand jury and said, "Man, I got to do something, man. I'm about to go back to Cali." Dorsey had previously been convicted of conspiracy to traffic in stolen motor vehicles and operating a chop shop and had served his sentence at a federal prison in California. Dorsey also told Diamond Gradney that Fullard and Tia Lovelace had received subpoenas and accused Gradney of being subpoenaed and not

telling him. And, presumably referring to Fullard, Dorsey said to Shawn Turner, "That bitch better not testify against me."

On the night of May 13, 2008, two days before Fullard's scheduled grand jury appearance, Fullard was cooking in the kitchen of her West Seattle apartment. At about 10:29 pm, seven shots were fired into the apartment through a window over the kitchen sink. Fullard's boyfriend, mother, and two children, then ages eight and ten, were also in the apartment. Three bullets struck Fullard and one struck her older son. Then two more shots were fired through a different window near the front door; they did not strike anyone. The gunshot wounds of Fullard and her son were not fatal.

Minutes after the shooting, between 10:33 pm and 10:42 pm, Dorsey made eight calls to police detectives from his cell phone. Detective Thomas Mooney received the first of Dorsey's calls to him that night just after he got the dispatch about the shooting at Fullard's apartment, at 10:29 pm. Mooney answered, and Dorsey told him that he was "at 23rd and Union" in Seattle and had found a man that Mooney was looking for. Mooney said that he had to go investigate a shooting and hung up. Then Dorsey called back and repeated that he was at 23rd and Union.

But here is the problem with Dorsey's alibi: Dorsey was not at 23rd and Union in the minutes after 10:29 pm on May 13, 2008. There is a dominant cellular tower at 23rd and Union, and Dorsey's cell phone call was not transmitted through that tower that night. Rather, between 9:16 pm and the time of the shooting, Dorsey's cell phone hit off of a cellular tower almost directly behind Fullard's apartment eight times and hit off of no other cellular tower during that period. Dorsey made no calls from his cell phone between 10:07 pm and 10:29 pm. At 10:33 pm, four or five minutes after the shooting and the time at which Dorsey called Mooney, Dorsey's cell phone hit off of a cellular tower near the east end

of the West Seattle Bridge, far from 23rd and Union and only a few minutes' driving distance from Fullard's apartment.

## B

The government filed a fourteen-count indictment against Dorsey and other participants in the vehicle-trafficking conspiracy. The government then filed a twenty-count superseding indictment and a twenty-two-count second superseding indictment against Dorsey. The second superseding indictment charged Dorsey with one count of conspiracy to traffic in motor vehicles or motor vehicle parts in violation of 18 U.S.C. § 371 (Count 1); two counts of operating a chop shop in violation of 18 U.S.C. § 2322(a)(1) and (b) (Counts 2 and 3); seventeen counts of trafficking in motor vehicles in violation of 18 U.S.C. § 2321(a) (Counts 4 through 20); one count of witness tampering in violation of 18 U.S.C. § 1512(a)(1)(A), (1)(C), (2)(A) and (2)(C) (Count 21); and one count of discharging a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A) (Count 22). Counts 21 and 22 were based on the government's allegation that Dorsey shot into Fullard's apartment to prevent her grand jury testimony.

Dorsey pleaded guilty to Counts 1 through 20, accepting his criminal liability for the charges of conspiracy, vehicle-trafficking, and operating a chop shop. But while agreeing to these serious offenses, Dorsey maintained his innocence on the counts relating to the shooting of planned grand jury witness Fullard. The case proceeded to trial on Counts 21 and 22.

Before trial, the government moved *in limine* to admit testimony from William Fomby, a co-conspirator who had pleaded guilty, that before the shooting he had seen Dorsey with a Glock firearm. After the pretrial motions hearing but before opening statements at trial, Mouy Harper, an ex-girlfriend of Dorsey's, told the prosecution that she, too, had seen Dorsey with a gun before the shooting. The district court

ruled that Fomby's testimony and Harper's testimony were admissible. The district court also ruled that the government's exhibit of a three-gun montage, from which Harper had identified a Glock as the gun that she had seen Dorsey possessing, was admissible.

Dorsey at trial stressed the lack of direct evidence against him. There were no eyewitnesses, no gun, no fingerprints, and no DNA linking him to the shooting. Dorsey contended that of several possible theories for the shooting, the police pursued only the theory that he was the shooter. But the government presented circumstantial evidence showing that Dorsey had definite knowledge of Fullard's receipt of a grand jury subpoena and a strong motive to prevent her grand jury testimony. The government also presented Dorsey's cell phone records and cellular tower data to show Dorsey's attempts to call the police to establish that he was someplace he was not at the time of the shooting. Technology was fatal to Dorsey's alibi because he used a cell phone that showed his proximity to the scene of the shooting, not to where he said he was when he called. That Dorsey tried to create a fake alibi was not merely ineffective, but also stands high in the hierarchy of evidence tending to show guilt.

In addition, Fomby testified that before the shooting he saw Dorsey retrieve a black, bulky gun that he thought was a Glock from the trunk of Harper's car. Harper testified that she recalled Dorsey taking something from the trunk of her car, that she once saw Dorsey with a charcoal gray gun, and that she had identified the first gun in the three-gun montage shown to her by the police—a Glock .40 caliber with a black polymer frame—as a gun that looked like the gun she saw. A firearm and toolmark examiner testified that the combined characteristics of the cartridge cases and bullets recovered from Fullard's apartment were consistent with a Glock or similar type of firearm.

During cross-examination Detective Paul Suguro remarked that Dorsey "did it." The district court at once told the jury to

disregard the comment and admonished Suguro in front of the jury. Dorsey moved for a mistrial. The district court denied the motion because it concluded that Dorsey was not prejudiced by Suguro's comment.

After an eight-day trial, the jury found Dorsey guilty on both counts. Dorsey moved for a new trial based on the admission of the testimony of Fomby and Harper that Dorsey possessed a gun before the shooting, and on Detective Suguro's comment that Dorsey "did it."[1] The district court denied the motion. The district court sentenced Dorsey to forty-eight years in prison: five years on Count 1, thirteen years each on Counts 2 and 3, ten years each on Counts 4 through 20, and thirty years on Count 21, all to run concurrent; and eighteen years on Count 22, to run consecutive to Counts 1 through 21. The district court entered judgment, and Dorsey timely appealed.

## II

Dorsey first challenges the district court's admission of the testimony of William Fomby and Mouy Harper on Dorsey's possession of a Glock-like gun in the months before the shooting. We review a district court's admission of evidence for abuse of discretion. *United States v. Rizk*, 660 F.3d 1125, 1130 (9th Cir. 2011). We review *de novo* whether evidence falls within the scope of Federal Rule of Evidence 404(b). *See id.* at 1131.

**[1]** Evidence is relevant if: "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Relevant evidence is generally admissible, though it may be excluded if its probative value

---

[1]Dorsey also sought a new trial based on the government's alleged failure to correct false or perjured testimony, but he does not raise that claim on appeal.

is substantially outweighed by a danger of unfair prejudice. *See* Fed. R. Evid. 402, 403. Federal Rule of Evidence 404(b) also limits the general admissibility of relevant evidence, as it makes evidence of other crimes, wrongs, or acts inadmissible to show propensity. *United States v. Curtin*, 489 F.3d 935, 943 (9th Cir. 2007) (en banc). Such evidence may be admissible for other purposes, however, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b).

**[2]** We have held that evidence should not be considered "other crimes" or "other act" evidence within the meaning of Rule 404(b) if "the evidence concerning the 'other' act and the evidence concerning the crime charged are inextricably intertwined." *United States v. Soliman*, 813 F.2d 277, 279 (9th Cir. 1987) (internal quotation marks, citation, and alteration omitted); *accord United States v. Williams*, 989 F.2d 1061, 1070 (9th Cir. 1993). Two general categories of other act evidence may be "inextricably intertwined" with a charged crime and thus exempted from the requirements of Rule 404(b). *United States v. Vizcarra-Martinez*, 66 F.3d 1006, 1012 (9th Cir. 1995). First, other act evidence may "constitute[ ] a part of the transaction that serves as the basis for the criminal charge." *Id.* Second, admission of other act evidence may be "necessary . . . to permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime." *Id.* at 1012-13.

Here, the government sought to introduce the testimony of Fomby and Harper about seeing Dorsey with a gun before the Fullard shooting. The government argued that this testimony was "inextricably intertwined" with the charged crimes of witness tampering and discharging a firearm during and in relation to a crime of violence. In the alternative, the government argued that the testimony was admissible under Rule 404(b) to prove Dorsey's identity as the shooter.

**[3]** We agree with the district court that the testimony of Fomby and Harper about seeing Dorsey with a Glock or

Glock-like gun was not "other act" evidence subject to Rule 404(b). Rather, given the expert testimony that a Glock or similar firearm was used to shoot into Fullard's apartment, Fomby's and Harper's testimony was evidence that Dorsey had a gun of the same or a similar type as the gun used in the shooting. The testimony was relevant because it tended to prove that Dorsey had the means to commit the charged crimes and that he was in fact the shooter. *See* Fed. R. Evid. 401. The gun testimony added to the circumstantial case against Dorsey, built primarily on his motive and the cell phone evidence, and thus formed part of the prosecution's "coherent and comprehensible story regarding the commission of the crime." *Vizcarra-Martinez*, 66 F.3d at 1012-13. Because the testimony bore directly on the commission of the charged crimes, it was inextricably intertwined with those crimes and outside the scope of Rule 404(b). *See id.* The district court properly admitted the testimony of Fomby and Harper as relevant evidence under Rules 401 and 402.

**[4]** We reject Dorsey's argument that the three-gun photo montage shown to Mouy Harper was impermissibly suggestive. The district court held a hearing on the montage, and there a police officer testified about the interview of Harper. Harper told the police that she had seen Dorsey with a gun and described the gun as big, bulky, and "like a cop gun," but indicated that she did not know if the gun she saw was a semiautomatic. The officer, knowing that most police agencies use Glocks and that some older police officers carry revolvers, then retrieved two Glocks commonly carried by police officers and a revolver to show to Harper. Harper immediately pointed to one of the Glocks and said that it was the gun she saw. Viewing the totality of the circumstances, we conclude that this identification procedure was not "so impermissibly suggestive as to give rise to a substantial likelihood of mistaken identification" and did not violate due process. *See United States v. Bagley*, 772 F.2d 482, 492 (9th Cir. 1985). The district court properly admitted the exhibit of the montage into evidence. The weight to be given Harper's identifi-

cation, considering the limited montage, was for the jury to decide. *See id.* at 494. This challenge to the montage went more to weight than to admissibility of the testimony of Harper about the gun.

**[5]** We also agree with the district court that the probative value of the gun testimony was not outweighed by a danger of unfair prejudice. *See* Fed. R. Evid. 403. As stated above, the testimony tied Dorsey to a gun that was the same as or similar to the gun likely used in the shooting. That Fomby and Harper saw a Glock-like gun on Dorsey three to four months before the shooting did not render their testimony excludable under Rule 403, even though testimony about a more proximate gun sighting might have been stronger proof of Dorsey's guilt. Evidence that Dorsey had a Glock-like gun in January or February of 2008 made it more likely that he still had that gun on the night of the shooting in May. Moreover, the evidence was not unfairly prejudicial. Testimony about mere gun possession was not likely to inflame the jury, and given the dissimilarity between mere possession and the charged crimes, both based on Dorsey's actual discharge of a gun, the risk of improper propensity reasoning was low.

**[6]** We hold that the district court did not abuse its discretion in admitting the Fomby and Harper testimony about seeing Dorsey with a Glock or similar gun before the shooting.

### III

Dorsey next contends that the government improperly vouched for Fomby's credibility when it elicited testimony on the truthfulness provisions of Fomby's plea agreement. Because Dorsey did not object to this testimony at trial, we review for plain error. *United States v. Combs*, 379 F.3d 564, 568 (9th Cir. 2004). Under plain-error review, reversal is proper only if there is (1) an error that is (2) clear or obvious, (3) affects substantial rights, and (4) "seriously affects the fairness, integrity or public reputation of judicial proceed-

ings." *United States v. Marcus*, 130 S. Ct. 2159, 2164 (2010) (internal quotation marks, citation, and alteration omitted). In determining whether vouching is plain error, we "balance the seriousness of the vouching against the strength of the curative instruction and closeness of the case." *United States v. Necoechea*, 986 F.2d 1273, 1278 (9th Cir. 1993).

**[7]** The prosecution may not vouch for the credibility of its witnesses by "placing the prestige of the government behind a witness through personal assurances of the witness's veracity" or "suggesting that information not presented to the jury supports the witness's testimony." *Id.* at 1276. Eliciting testimony on direct examination that a witness entered into a plea agreement that requires truthful testimony may constitute vouching. *United States v. Wallace*, 848 F.2d 1464, 1474 (9th Cir. 1988). That a plea agreement requires a witness to tell the truth might be argued to suggest that a witness, "who might otherwise seem unreliable, has been compelled by the prosecutor's threats and the government's promises to reveal the bare truth" and that "the prosecutor can verify the witness's testimony and thereby enforce the truthfulness condition of its plea agreement." *Id.* Such an inference might be drawn by a juror, but referring to a plea agreement's mandate to be truthful does not constitute vouching for a witness if such references are "made in response to an attack on the witness's credibility because of his plea bargain," including an attack in defense counsel's opening statement. *United States v. Monroe*, 943 F.3d 1007, 1013-14 (9th Cir. 1991); *see also Necoechea*, 986 F.2d at 1278-79.

Here, the prosecutor asked Fomby about the truthfulness requirements of his plea agreement only after defense counsel attacked Fomby's credibility. In his opening statement, defense counsel said that the first time the police asked Fomby about Dorsey, Fomby said that he did not even know Dorsey, but that later, the police told Fomby that they could give him favorable treatment, depending on what he had to say about Dorsey. Defense counsel continued, "Fomby, you'll

hear, is a convicted perjurer. He's getting a deal from the government. And he's been consistently inconsistent every time he's been spoken to." On direct examination, the following exchange between the prosecutor and Fomby took place:

Q: Now, you pled guilty to conspiracy to traffic in motor vehicles, did you not?

A: Correct.

Q: And you entered into a cooperating plea agreement with the United States of America, did you not?

A: Yes.

Q: What is your understanding of the cooperating agreement?

A: To tell the complete truth.

Q: Does it require you to cooperate with the United States?

A: Yes.

Q: And what must your cooperation be?

A: To tell the complete truth.

Q: Are you required to testify as part of your cooperation?

A: Correct.

Q: And what must your testimony be?

A: The complete truth.

Q:  Isn't it true, sir, that the United States will not tolerate any deception from you?

A:  Correct.

Q:  What do you hope to gain from the United States and from this court for your complete and truthful testimony?

A:  Some leniency on my sentence.

**[8]** The prosecutor asked these questions after defense counsel attacked Fomby's credibility in part because of Fomby's plea bargain. As a result, the references to the truthfulness provisions of Fomby's plea agreement did not constitute vouching. *See Monroe*, 943 F.2d at 1014. Defense counsel implied in his opening statement that Fomby was a liar and that he was biased because he got "a deal from the government." The prosecutor permissibly responded to this attack by eliciting testimony that Fomby's plea agreement required him to tell the truth. When the defense opens a door, it should not be surprised to see the prosecutor enter.

Dorsey particularly challenges the prosecutor's question, "Isn't it true, sir, that the United States will not tolerate any deception from you?" Dorsey argues that Fomby's affirmative answer to this question amounted to testimony that the government was "monitoring" Fomby's testimony for truthfulness. Among the factors that we consider in reviewing vouching claims are "how much the vouching implies that the prosecutor has extra-record knowledge of or the capacity to monitor the witness's truthfulness" and "any inference that the court is monitoring the witness's veracity." *Necoechea*, 986 F.2d at 1278. A statement that the government would "not tolerate any deception" might be argued to imply that the government would know if Fomby was lying and thus had "the capacity to monitor [his] truthfulness." But in the total circumstances, the prosecutor's question was not improper

vouching. Fomby's credibility had been attacked, and saying that deception will not be tolerated is little different from saying that the witness must testify truthfully. The prosecutor did not refer to extra-record facts or say that it could verify that Fomby was telling the truth. *Cf. United States v. Rudberg*, 122 F.3d 1199, 1204-06 (9th Cir. 1997) (reversing for plain error because prosecutor's actions suggested that FBI verified accuracy of witnesses' testimony through investigations and that "testimony of several such witnesses ha[d] already been found truthful by the court"); *United States v. Shaw*, 829 F.2d 714, 717 (9th Cir. 1987) (discussing significance of "extra-record reference to verification").

**[9]** We hold that the prosecutor did not improperly vouch for Fomby's credibility.

## IV

**[10]** Dorsey contends that Detective Suguro's comment that Dorsey "did it" was improper vouching and requires a new trial. Because Dorsey objected to this comment at trial, we review for harmless error. *United States v. Hermanek*, 289 F.3d 1076, 1098 (9th Cir. 2002). We will reverse only if, viewing Suguro's comment "in the context of the entire trial," "it is more probable than not that [it] materially affected the verdict." *United States v. Sarkisian*, 197 F.3d 966, 988 (9th Cir. 1999) (internal quotation marks and citations omitted). We review a district court's denial of a motion for a mistrial or new trial for abuse of discretion. *United States v. Washington*, 462 F.3d 1124, 1135 (9th Cir. 2006).

In cross-examining Detective Suguro, defense counsel tried to show that Dorsey could have learned about the Fullard shooting from the media or other sources. He asked, "So it would not be surprising or remarkable to say that he probably knew about it, would it?" Suguro answered, "Well, of course. He did it." Defense counsel then asked, "He did what?" Before Suguro could answer, the district court interjected,

"The jury should disregard the last remark. Detective, just limit your answers to the questions that counsel asks you."

Dorsey moved for a mistrial based on Detective Suguro's comment. The district court denied the motion, reasoning that Dorsey was not prejudiced by the comment. The district court concluded not only that Suguro's testimony "did not hurt the defense case," but that in fact his testimony "severely hurt the government's case." The district court noted that it was not "a sudden revelation to the jury" that the police thought Dorsey was guilty and that Suguro's improper remark "fit right into" defense counsel's opening statement that the police had "tunnel vision" and investigated only Dorsey, to the exclusion of other potential suspects. The district court also noted that it had immediately instructed the jury to disregard Suguro's comment and had reprimanded Suguro "in a stern voice, with a disapproving look," for the jury to see. The district court gave defense counsel the option of an additional curative instruction, but defense counsel declined such an instruction. After the verdict, the district court denied Dorsey's motion for a new trial, again stressing the strength of its immediate curative instruction and stating, "I was convinced then and I am convinced now that it did not permeate the trial to the extent that it created an unfair or inappropriate result."

**[11]** Detective Suguro's conduct in stating that Dorsey "did it" was incorrect. As an experienced police officer, Suguro should have known not to comment on Dorsey's guilt on the witness stand. But in the context of the entire trial, we conclude that the improper comment was more probably than not harmless. *See Sarkisian*, 197 F.3d at 988.

**[12]** When Suguro said that Dorsey "did it," the district court took prompt action to prevent any prejudice. Before defense counsel objected or Suguro could answer the next question, the district court told the jury to disregard Suguro's statement and told Suguro to limit his answers to the questions asked. In light of our "strong presumption that jurors

follow instructions," *Miller v. City of L.A.*, 661 F.3d 1024, 1030 (9th Cir. 2011), the district court's swift rebuke in front of the jury prevented Suguro's improper comment from materially affecting the verdict, *see Washington*, 462 F.3d at 1136 ("A judge's prompt corrective action in response to improper comments usually is sufficient to cure any problems arising from such improper comments."); *United States v. Younger*, 398 F.3d 1179, 1192 (9th Cir. 2005).

**[13]** Because Suguro's remark, though improper, did not prejudice Dorsey, we hold that the district court did not abuse its discretion in denying Dorsey's motions for a mistrial and new trial.

## V

Dorsey's final challenge is to his eighteen-year sentence on Count 22. In sentencing Dorsey on this count, the district court held that the statutory sentencing range for Dorsey's 18 U.S.C. § 924(c)(1)(A) conviction was ten years to life. Dorsey contends that the district court erred because the statutory maximum sentence under § 924(c)(1)(A) is the mandatory minimum sentence of ten years. We review this issue of statutory interpretation *de novo*. *See United States v. Devorkin*, 159 F.3d 465, 466 (9th Cir. 1998).

**[14]** The mandatory minimum sentence for discharging a firearm during and in relation to a crime of violence is ten years. 18 U.S.C. § 924(c)(1)(A)(iii) (providing for "term of imprisonment of not less than 10 years"). Section 924(c)(1)(A) does not specify a maximum sentence.

**[15]** We first reject Dorsey's contention that the statutory maximum is the mandatory minimum. In setting the sentence for a § 924(c)(1)(A)(iii) conviction at "not less than" ten years, Congress created a floor. A plain reading of the statute leads us to conclude that there must be permissible sentences above that floor. The statute's legislative history supports our

conclusion. Before 1998, § 924(c) set mandatory sentences; in 1998, Congress amended § 924(c) to change the once-mandatory sentences to mandatory minimum sentences. Pub. L. No. 105-386, § 1, 112 Stat. 3469 (1998). *Compare* 18 U.S.C. § 924(c)(1) (1994) (stating that a person shall "be sentenced to imprisonment for five years" for using or carrying a firearm during and in relation to a crime of violence), *with* 18 U.S.C. § 924(c)(1)(A)(i) (2006) (stating that such a person shall "be sentenced to a term of imprisonment of not less than 5 years"). The 1998 amendment signals Congress's intent that the ten-year sentence in § 924(c)(1)(A)(iii) be "the minimum or the floor, not the floor and ceiling as the prior version of the statute provided," and that it "left open the ceiling." *See United States v. Sias*, 227 F.3d 244, 246 (5th Cir. 2000). For these reasons, the district court correctly concluded that the statutory maximum sentence under § 924(c)(1)(A) is greater than the mandatory minimum.

[16] We next address whether the statutory maximum is life or something less than life but more than ten years. The Supreme Court's decision in *Harris v. United States*, 536 U.S. 545 (2002), suggests a maximum of life imprisonment. The *Harris* plurality held that brandishing a firearm is a sentencing factor rather than an element of the offense in § 924(c)(1)(A), reasoning that because the statute's "subsections alter only the minimum, the judge may impose a sentence *well in excess of* seven years, whether or not the defendant brandished the firearm."[2] *Id.* at 554, 556 (emphasis added). In dissent, Justice Thomas explicitly referred to "the statutory maximum of life imprisonment for any violation of § 924(c)(1)(A)." *Id.* at 574 (Thomas, J., dissenting); *see also United States v. O'Brien*, 130 S. Ct. 2169, 2182 (2010) (Stevens, J., concurring) (noting that § 924(c)(1) "contains an *implied* statutory maximum of life"); *id.* at 2184 (Thomas, J., concurring in the judgment) (stating that penalty range under

---

[2] Subsection ii provides a seven-year minimum for brandishing. 18 U.S.C. § 924(c)(1)(A)(ii).

§ 924(c)(1)(A)(i) is "five years to life imprisonment"). Relying on *Harris*, we have stated in dicta that the maximum sentence under § 924(c)(1)(A) is life imprisonment. *See* Washington, 462 F.3d at 1139 & n.8; *United States v. Dare*, 425 F.3d 634, 640 (9th Cir. 2005). Each of our sister circuits to address this issue has similarly concluded—some of them holding, not merely stating in dicta—that the statutory maximum is life. *See United States v. Shabazz*, 564 F.3d 280, 289 (3d Cir. 2009) (holding statutory maximum is life imprisonment and affirming sentence of 360 months); *United States v. Johnson*, 507 F.3d 793, 798 (2d Cir. 2007) (affirming sentence of life imprisonment); *United States v. Gamboa*, 439 F.3d 796, 811 (8th Cir. 2006) (stating maximum is life in dicta); *United States v. Avery*, 295 F.3d 1158, 1170 (10th Cir. 2002) (same); *United States v. Cristobal*, 293 F.3d 134, 147 (4th Cir. 2002) (same); *United States v. Sandoval*, 241 F.3d 549, 551 (7th Cir. 2001) (same); *United States v. Pounds*, 230 F.3d 1317, 1319 (11th Cir. 2000) (same); *Sias*, 227 F.3d at 246 (holding maximum is life and affirming ten-year sentence for § 924(c)(1)(A)(ii) conviction).

Dorsey contends that § 924(c)(1)(A) cannot be interpreted to have a maximum of life because of the rule of lenity. The rule of lenity has been a guide to interpreting criminal statutes since early in our nation's history. Chief Justice Marshall explained in *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95 (1820), that "penal laws are to be construed strictly." Or, as Justice Frankfurter stated in *Bell v. United States*, 349 U.S. 81, 83 (1955), "[A]mbiguity should be resolved in favor of lenity," and thus "[i]t may fairly be said to be a presupposition of our law to resolve doubts in the enforcement of a penal code against the imposition of a harsher punishment."

The rule of lenity, however, is not an absolute rule but rather a maxim to guide statutory interpretation. *See Wiltberger*, 18 U.S. (5 Wheat.) at 95. Our application of principles of statutory interpretation, giving due respect to the rule of len-

ity, leads us to follow the precedential path set by prior courts. Many reasons support this conclusion.

First, we cannot construe § 924(c)(1)(A) in a way lenient to Dorsey that is at odds with the clear language used by Congress. As explained above, whatever else may be meant by the term "not less than" within § 924(c)(1)(A), it cannot sensibly be interpreted to mean "not more than." Second, our law has endorsed the idea that we will not lightly create a circuit split. *Sternberg v. Johnston*, 595 F.3d 937, 948 (9th Cir. 2010). Accordingly, we start off inclined to follow the consistent decisions of the Second, Third, and Fifth Circuits, which have squarely addressed this issue. *See Shabazz*, 564 F.3d at 289; *Johnson*, 507 F.3d at 798; *Sias*, 227 F.3d at 246. Third, we think it appropriate to give some weight to the dicta of our own and other circuits suggesting that § 924(c)(1)(A) has life imprisonment as a maximum. *See Washington*, 462 F.3d at 1139 & n.8; *Gamboa*, 439 F.3d at 811; *Avery*, 295 F.3d at 1170; *Dare*, 425 F.3d at 640; *Cristobal*, 293 F.3d at 147; *Sandoval*, 241 F.3d at 551; *Pounds*, 230 F.3d at 1319. Fourth, although the Supreme Court has not expressly voiced an opinion on the statutory maximum for violating § 924(c)(1)(A), dicta from more than one Justice endorses life imprisonment as the maximum term. *See O'Brien*, 130 S. Ct. at 2182 (Stevens, J., concurring); *Harris*, 536 U.S. at 574 (Thomas, J., dissenting). Fifth, Congress legislates with existing judicial opinions in mind. *See Egebjerg v. Anderson (In re Egebjerg)*, 574 F.3d 1045, 1050 (9th Cir. 2009). Since the 1998 amendment to § 924(c), the consensus among the Courts of Appeals has been that the maximum is life. This is the background against which Congress has enacted new laws and amended old ones, and it has not seen fit to correct or disagree with the Courts of Appeals.

Finally, our holding in *United States v. Bland*, 961 F.2d 123 (9th Cir. 1992), strongly supports our conclusion today. There we rejected a rule of lenity challenge to a life sentence imposed pursuant to 18 U.S.C. § 924(e), which provides for

a term of imprisonment of "not less than fifteen years," but like § 924(c)(1)(A), does not state a maximum. *Id.* at 128. We held that "a life sentence is authorized by § 924(e)," reasoning that the rule of lenity did not apply to preclude a life sentence because § 924(e) was "not ambiguous in terms" and was "clearly intended to incapacitate and to punish severely recidivist violent and armed felons." *Id.* (internal quotation marks omitted).[3]

**[17]** In other words, where Congress has been silent on the maximum term of imprisonment for a serious crime, but has made clear its intent that offenders be punished severely, we may imply that the maximum available sentence is life. *See id.*; *see also Washington*, 462 F.3d at 1139 n.8 (stating in dicta that "[w]hen a statute fails to state a maximum sentence, the maximum available sentence under the statute is life"); *United States v. Brame*, 997 F.2d 1426, 1428 (11th Cir. 1993) (collecting cases from Second, Third, Fourth, Fifth, Seventh, and Tenth Circuits concluding § 924(e) has maximum of life). In amending § 924(c), Congress not only changed once-mandatory sentences to mandatory minimum sentences, but also added the requirement that sentences be imposed consecutively, and expressed a clear intent to punish severely criminals who use guns while committing violent crimes. *See* 18 U.S.C. § 924(c)(1)(A), (D)(ii); § 1, 112 Stat. at 3469; 961 F.2d at 128; *see also, e.g.*, *Criminal Use of Guns: Hearing on S. 191 Before the S. Comm. on the Judiciary*, 105th Cong. 4 (1997) (statement of Sen. Jesse Helms) (calling for amendment of § 924(c) to fight violent crime "with the most severe punishment possible for those who terrorize law-abiding citizens"); 144 Cong. Rec. H10,329 (Oct. 9, 1998) (statement of Rep. Betty McCollum) ("Criminals who carry guns while committing serious crimes are making a clear and unequivo-

---

[3]In light of our interpretation of § 924(e) in *Bland*, we reject Dorsey's contention that because some subsections of § 924 expressly authorize life sentences, we cannot interpret § 924(c) to impliedly authorize a life sentence.

cal statement to the world, I will hurt you or kill you if you get in my way. Such persons should be punished severely, and that is what this legislation will do."). Because Congress has made clear that § 924(c)(1)(A) offenses are to be punished severely, the rule of lenity is not properly applied here.

**[18]** We hold that the maximum sentence for a § 924(c)(1)(A) conviction is life imprisonment. Because the sentencing range on Dorsey's § 924(c)(1)(A) conviction was ten years to life, the district permissibly sentenced him to an eighteen-year term of imprisonment on Count 22.

**AFFIRMED.**