**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
         *Plaintiff-Appellee*,

v.

MARTIN ALCANTARA-CASTILLO,
         *Defendant-Appellant*.

No. 12-50477

D.C. No.
3:11-cr-03876-
AJB-1

OPINION

Appeal from the United States District Court
for the Southern District of California
Anthony J. Battaglia, District Judge, Presiding

Argued and Submitted
December 4, 2013—Pasadena, California

Filed June 11, 2015

Before: Dorothy W. Nelson, Kim McLane Wardlaw,
and Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge Wardlaw;
Dissent by Judge Rawlinson

**SUMMARY**[*]

### Criminal Law

Reversing a conviction for illegal reentry, the panel held that the government's improper cross-examination and argument deprived the defendant of the fair trial guaranteed by the Due Process Clause.

The panel held that error occurred when the prosecutor implicitly and then explicitly asked the defendant to comment on a Border Patrol agent's veracity during cross-examination. The panel also held that, as the government conceded, the government improperly vouched for the Border Patrol agent's credibility by referring during its rebuttal argument to facts not before the jury – that Border Patrol agents are "sworn to uphold the law" – in a credibility showdown between the Border Patrol agent and the defendant.

The panel did not need to decide whether to apply harmless error analysis because even under the more restrictive plain error standard the combined misconduct requires reversal.

Dissenting, Judge Rawlinson wrote that the prosecutor's isolated question in response to the defendant's spontaneous challenge to the Border Patrol agent's veracity during cross-examination does not rise to the level of plain error; that the district court did not abuse its discretion in denying a curative instruction during the prosecutor's rebuttal argument, where

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

it granted the defendant's motion to strike and instructed the jury to disregard the prosecutor's comment that the Border Patrol agents were "sworn to uphold the law"; and that it is highly unlikely that the prosecutor's comment materially affected the verdict.

## COUNSEL

Paul A. Barr (argued), Federal Defenders of San Diego, Inc., San Diego, California, for Defendant-Appellant.

Laura E. Duffy, United States Attorney, Bruce R. Castetter, Assistant United States Attorney, Chief, Appellate Section, Criminal Division, and Kyle W. Hoffman (argued), Assistant United States Attorney, San Diego, California, for Plaintiff-Appellee.

## OPINION

WARDLAW, Circuit Judge:

Martin Alcantara-Castillo (Alcantara) appeals his jury trial conviction for illegal reentry in violation of 8 U.S.C. § 1326. Because the government's improper cross-examination and argument deprived Alcantara of the fair trial guaranteed by the Due Process Clause, we reverse.

## I.

On June 26, 2011, Border Patrol Agent Aaron Hunter responded to a report that a motion sensor had been activated approximately seven miles east of the Tecate port of entry.

Searching the area, he found Alcantara lying next to an abandoned cargo container approximately one mile north of the Mexican border. Alcantara was carrying a backpack and was very dirty. Agent Hunter approached Alcantara, questioning him in Spanish. Alcantara admitted that he was a "citizen of Mexico and that he did not have any documents allowing him to be in the United States."

Agent Hunter testified that as he escorted Alcantara toward the highway where he had parked his patrol car, Alcantara spontaneously began talking. According to Agent Hunter, Alcantara volunteered that he had crossed the border on foot the previous night with a group that had been chased by border patrol agents on all-terrain vehicles. Alcantara said he had become separated from the group and had decided to turn around and return to Mexico. As Agent Hunter and Alcantara returned to the highway, two other Border Patrol agents joined them. They searched Alcantara, finding empty bottles and food containers in his backpack.

On cross-examination, Agent Hunter acknowledged that he did not personally search Alcantara's backpack, that he did not take an inventory of its contents, and that he could not specifically identify what was inside. Agent Hunter also testified that on the day of Alcantara's arrest he provided information about the arrest to another agent who prepared an official report, after which Agent Hunter wrote a detailed addendum to the report. Neither of those documents contain any mention of Alcantara's spontaneous admissions about crossing the border with a group, being chased by border patrol agents on all-terrain vehicles, and attempting to return to Mexico. Nor could Agent Hunter recall that he told anyone at all about these spontaneous statements until he met

with prosecutors in preparation for Alcantara's trial seven months after Alcantara's arrest.

Border Patrol Agent Joseph Moore testified that the night before Alcantara's arrest, he was notified that a group of nine aliens had been observed near the border. Four of the group had been apprehended immediately, but five had fled. Agent Moore searched the area and was able to apprehend four more aliens, but he could not locate the ninth member of the group, whose sex and identity were unknown.

Taking the witness stand, Alcantara testified that he had unknowingly entered the United States during a period of methamphetamine-induced psychosis. Border Patrol Agent Luis Martinez, who interviewed Alcantara shortly after his arrest, testified that pursuant to Border Patrol policy, he immediately terminated that interview when Alcantara stated that he was under the influence of methamphetamine. However, Agent Martinez did not observe anything in Alcantara's demeanor that led him to believe Alcantara was under the influence of methamphetamine, although Alcantara was hunched over during the interview.

Alcantara admitted that he had been addicted to methamphetamine since 1995 and used the drug daily, stopping only when he was incarcerated. On June 24, 2011, while high on methamphetamine, he impulsively decided to enter a rehabilitation program after talking with another methamphetamine user about a friend who had died three months earlier due to drug abuse. Alcantara went to a bus depot in Tijuana, where he lived, early in the morning on June 25, for the purpose of traveling to a drug rehabilitation facility located in El Hongo, east of Tecate. Before boarding,

however, he purchased some more methamphetamine near the bus depot in Tijuana.

Upon his arrival in Tecate, Alcantara decided to visit a friend who lived on the outskirts of the city to tell him that he was going to check into a rehabilitation clinic, but he never reached his friend's home. While walking there along some railroad tracks, he encountered two men in a railroad tunnel with whom he began a conversation. Alcantara ended up smoking methamphetamine with these men—a larger quantity of methamphetamine than he had ever used before. Alcantara testified that he began to hallucinate, and that the next thing he remembered was walking down a road, seeing a small farm with some palm trees, picking up a bottle of water, and lying down next to a container of some sort. Without objection, the defense introduced a photograph of the railroad tunnel, and Alcantara showed the jury where he had been walking, where the train tracks were, and where he stumbled upon the two men.

Alcantara thought he was on the road that goes from Tecate to Mexicali in Mexico. It was not until Agent Hunter approached and he saw Agent Hunter's uniform that he realized he was in the United States. Alcantara acknowledged that he told Agent Hunter he was from Mexico, but did not remember saying anything else to him except to ask for water.

Two additional witnesses testified for the defense. A medical expert in addiction psychiatry who had interviewed Alcantara opined that Alcantara was severely methamphetamine dependent, based upon Alcantara's description of his methamphetamine use. He further testified that people who use methamphetamine daily may suffer

hallucinations, paranoia, and disorientation as to time and place, especially if they are also suffering from sleep deprivation, dehydration, or extreme heat. A defense investigator also testified that she had visited a drug rehabilitation facility in El Hongo, along the highway from Tecate to Mexicali, and had located a railroad tunnel near the border in the eastern outskirts of Tecate. The defense also introduced a photograph of a gap in the border fence near the site of Alcantara's arrest.

The jury found Alcantara guilty, and the district court sentenced him to a forty-month term of imprisonment. Alcantara timely appealed.

## II.

We have jurisdiction pursuant to 28 U.S.C. § 1291. Where the defendant has objected to alleged prosecutorial misconduct at trial, we review for harmless error.[1] We view the challenged conduct "in the entire context of the trial," and reverse "only if it appears more probable than not that prosecutorial misconduct materially affected the fairness of the trial." *Ruiz*, 710 F.3d at 1082 (quoting *Younger*, 398 F.3d at 1190). Where the defendant has not objected to the alleged misconduct at trial, we review for plain error. We may

---

[1] "Misconduct" is the term of art that we regularly use to describe improper behavior by prosecutors that is inconsistent with the due process requirements of a fair trial. *See, e.g.*, *United States v. Ruiz*, 710 F.3d 1077, 1082 (9th Cir.), *cert. denied*, 134 S. Ct. 488 (2013); *United States v. Wright*, 625 F.3d 583, 609–10, 613 (9th Cir. 2010); *United States v. Younger*, 398 F.3d 1179, 1190 (9th Cir. 2005); *United States v. Kerr*, 981 F.2d 1050, 1051–52 (9th Cir. 1992). The use of this generic term does not necessarily imply that the prosecutor intentionally broke the rules or acted in bad faith.

reverse if: (1) there was error; (2) it was plain; (3) it affected the defendant's substantial rights; and (4) "viewed in the context of the entire trial, the impropriety seriously affected the fairness, integrity, or public reputation of judicial proceedings." *United States v. Combs*, 379 F.3d 564, 568 (9th Cir. 2004) (quoting *United States v. Geston*, 299 F.3d 1130, 1135 (9th Cir. 2002)). When assessing the combined prejudicial effect of multiple errors, only as to some of which the defense registered a timely objection, we apply the plain error standard. *See United States v. Weatherspoon*, 410 F.3d 1142, 1150–51 (9th Cir. 2005).

## III.

A prosecutor "is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935). A "prosecutor's job isn't just to win, but to win fairly, staying well within the rules." *United States v. Maloney*, 755 F.3d 1044, 1046 (9th Cir. 2014) (en banc) (quoting *United States v. Kojayan*, 8 F.3d 1315, 1323 (9th Cir. 1993)).

A prosecutor must not ask defendants during cross-examination to comment on the truthfulness of other witnesses. *See, e.g.*, *United States v. Harrison*, 585 F.3d 1155, 1158 (9th Cir. 2009); *Combs*, 379 F.3d at 572; *United States v. Sanchez* 176 F.3d 1214, 1219–20 (9th Cir. 1999). This rule is "black letter law," *Harrison*, 585 F.3d at 1158, and it ensures that determinations of credibility remain within the sole province of the jury. *See Sanchez*, 176 F.3d at 1219–20. Nor may prosecutors "vouch" for a witness by

offering their personal opinion of a witness's testimony, or suggesting that information exists outside the record that verifies the witness's truthfulness. *See, e.g.*, *Weatherspoon*, 410 F.3d at 1146–48; *Combs*, 379 F.3d at 574–75; *Sanchez*, 176 F.3d at 1224. Vouching compromises the integrity of the trial and denies the defendant due process because the "prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *United States v. Reyes*, 577 F.3d 1069, 1077 (9th Cir. 2009) (internal quotation marks omitted).

Alcantara argues that the government engaged in improper questioning or vouching on four occasions during his trial. We conclude that there were two instances of improper conduct.

## A.

Error occurred when the prosecutor implicitly and then explicitly asked Alcantara to comment on Agent Hunter's veracity during cross-examination. Agent Hunter had testified to certain "spontaneous" admissions made by Alcantara, but Alcantara testified that he only asked Agent Hunter for water and acknowledged his Mexican citizenship. Toward the end of the government's cross-examination of Alcantara, the prosecutor initiated the following exchange:

> Q: Now, it's your testimony you didn't recall any additional statements you made to the Border Patrol Agent on the day of your arrest for this case, correct?

A: I don't remember having told him anything.

Q: You sat here throughout this trial, correct?

A: Yes.

Q: And you heard Border Patrol Agent Hunter testify that you had told him about coming in the day before with a group? You've heard that, correct?

A: I don't remember. I don't remember.

Q: You were sitting right here yesterday.

A: Yes, but I don't remember if he said that.

Q: You don't remember him saying, and your attorney repeatedly asking him, about your statements: that you had crossed over the day before and gone further north with a group? You don't remember that?

A: I don't think so. I don't think I crossed with people. I wasn't with people.

Q: That is not what I'm asking you. I'm asking you if you remember Agent Hunter, yesterday, telling the jury that you had made the statement that you had told him that you had crossed and gone further north?

A: Agent Hunter, he can say whatever he wants. He is saying I had a black sweater the day of my arrest, that I had food in my backpack, and there is nothing of that. That was all invented. All these things were invented.

Q: Your testimony is that Agent Hunter is inventing stories about you; is that correct?

A: Where are my things?

Defense counsel objected to "this line of questioning as vouching for Agent Hunter's testimony." The district court erred by overruling this objection. But even if we view counsel's objection as untimely, it was plain error to permit the prosecutor to ask, "Your testimony is that Agent Hunter is inventing stories about you; is that correct?" We found analogous questioning improper in *Combs*, 379 F.3d at 567, 572. There, a DEA agent testified that the defendant admitted to manufacturing methamphetamine. *Id.* at 567. The defendant testified that he never made such an admission, and on cross-examination, the prosecutor questioned the defendant as follows:

Q: You told Special Agents Bailey and Cory that you last manufactured methamphetamine on or about August 5, isn't that correct?

A: I did not.

Q: So Special Agent Bailey is making that up?

A: I told you what happened. He said. I didn't say. He answered. I ended the interview.

Q: So you are saying that Special Agent Bailey is lying in his testimony?

*Id.* Just as the prosecutor asked the defendant in *Combs* if Special Agent Bailey was "making that up" or "lying in his testimony," the prosecutor here asked Alcantara if Agent Hunter was "inventing stories about you." In *Combs*, we concluded that the prosecutor's questioning constituted plain error. *Id.* at 572. *See also Harrison*, 585 F.3d at 1158 (finding error where the prosecutor asked the defendant if two testifying police officers were lying); *Sanchez*, 176 F.3d at 1219–20 (finding error where the prosecutor forced the defendant to call a U.S. marshal who testified a liar).

The dissent, assuming that plain error is the correct legal standard, finds a "crucial distinction" between this case and others because the prosecutor used the word "invent" instead of the word "lie." Dissent at 32–33. This distinction is not meaningful, much less "crucial." In the context we address, to "lie" and to "invent" have identical meanings: to fabricate information. *See* Black's Law Dictionary 1062 (10th ed. 2014) (defining "lie" as "[a] false statement or other indication that is made with knowledge of its falsity; an untruthful communication intended to deceive"); Webster's Third New International Dictionary 1188 (2002) (defining the secondary meaning of the verb "invent" as "to think up or imagine: concoct mentally: fabricate"); *id.* at 1305 (defining

the verb "lie" as "to make an untrue statement with intent to deceive: tell a lie"); *see also* 8 Oxford English Dictionary 39 (2d ed. 1989) (defining the secondary meaning of the verb "invent" as "[t]o devise something false or fictitious: to fabricate, feign, 'make up'"); *id.* at 905 (defining the verb "lie" as "[t]o tell a lie or lies, to utter falsehood; to speak falsely").   No matter which words are used to mean "intentional deception," the concept remains the same: it is improper to compel the defendant "to comment on the truthfulness of another witness." *Harrison*, 585 F.3d at 1158.

The dissent's reliance on *United States v. Greer*, 640 F.3d 1011 (9th Cir. 2011), is misplaced.  We noted in *Greer* that we had "not yet addressed whether it is improper for the prosecutor to ask the defendant, as the prosecutor did in [that] case, if a witness testified 'inaccurately.'"  *Id.* at 1023.  We distinguished that question from asking "whether a government witness had been 'less than candid' during his testimony."  *Id.*, n.8.  Reasoning that "[b]ecause we see no difference between asking whether a witness was 'lying' or being 'less than candid,'" we held that the "less than candid" question "was improper."  *Id.*

Here, the prosecutor did not ask whether the agent's testimony was inaccurate; he asked whether the agent was "inventing stories" about Alcantara.  Inaccuracy or mistake can be achieved through inadvertence or other unintentional error.  Lying, making up, or inventing are all deliberate and intentional falsehoods, like "being less than candid."  Do we really want to narrow the prohibition against asking the defendant to comment on the veracity of another agent to the use of the word "lie?"  Prosecutors could simply evade the rule by asking whether another witness was "not telling the truth," fibbing, fabricating, making the story up, falsifying,

committing perjury, being "less than candid," or whether his story was "cock and bull."[2]   Surely the admonition against asking a defendant to comment on a government witness's veracity is violated equally when any of these formulations is used.   The remaining questions to be asked on plain error review should be answered by addressing the circumstances of each case.

We also reject the government's assertion that the prosecutor was merely following up appropriately after Alcantara "spontaneously attacked" Agent Hunter's credibility.   In *United States v. Moreland*, 622 F.3d 1147 (9th Cir. 2010), the government summarized the relevant testimony of one of its witnesses and asked the defendant whether he remembered the testimony.   *Id.* at 1159.   The defendant responded, "That's what her testimony was.   That is not true."   *Id.*   We held that this response did not justify further questioning of the defendant about the witness's credibility.   *Id.* at 1160.   Indeed, we found the government's argument that "the prosecution had no choice but to follow up Moreland's statement by asking whether [the witness] was lying" to "make[] little sense."   *Id.*   While the follow-up questions about the witness's credibility in *Moreland* were more extensive than the single follow-up question here, the principle nonetheless applies.

Moreover, Alcantara's comments about Agent Hunter's testimony were not spontaneous, but were in fact induced by the line of the prosecutor's questioning, in which he pressed Alcantara five times about Agent Hunter's testimony before

---

[2] "Tell a tale of cock and bull, / Of convincing detail full; / Tale tremendous, / Heaven defend us! / What a tale of cock and bull!"   W.S. Gilbert, *The Yeomen of the Guard*, Act II (1888).

Alcantara responded that the Agent's testimony as to the black sweater, food in the backpack, and "[a]ll these things were invented." There is only one plausible explanation for the prosecutor's persistent effort to confirm that Alcantara had heard Agent Hunter's previous testimony: to induce Alcantara to comment on whether that testimony was true. And the prosecutor ultimately achieved the desired result: Following Alcantara's "[a]ll these things were invented" testimony, the prosecutor immediately pounced with, "Your testimony is that Agent Hunter is inventing stories about you; is that correct?" Alcantara was once again forced to comment on Agent Hunter's veracity, and he did by asking the prosecutor "Where are my things?," as if to prove Agent Hunter was lying when he testified as to the contents of Alcantara's backpack.

The government argues that the prosecutor might have asked these questions to determine whether Agent Hunter's testimony had refreshed Alcantara's recollection of his statements on the day of his arrest. This explanation makes little sense, however, as Alcantara had just testified on direct that he did not recall making those statements, so it was already evident that his memory had not been refreshed by Agent Hunter's testimony the day before. The natural and sole purpose of asking Alcantara about Agent Hunter's testimony recounting Alcantara's alleged statements—rather than simply asking about the statements themselves—was to induce Alcantara to comment on Agent Hunter's veracity. Whether Alcantara "remembered" Agent Hunter's testimony was of no import to the case; the prosecutor achieved what he wanted when his questioning resulted in Alcantara's testimony that Agent Hunter had invented his story. Thus, the prosecutor improperly created a scenario that forced Alcantara to comment on Agent Hunter's veracity.

B.

The prosecutor's initial closing argument was not plainly improper. The central theme of the government's argument was to compare Agent Hunter's credibility with Alcantara's credibility. The prosecutor began his argument by stating: "Credibility. This case is largely going to come down to the issue of credibility." He then compared the two key witnesses' competing narratives of events. "[I]f you believe Border Patrol Agent Aaron Hunter," the prosecutor argued, then Alcantara confessed to having knowingly entered the United States with a group. "If you believe the defendant's story," by contrast, "then it would have been impossible" for Alcantara to have confessed because he did not know he had entered the United States. The prosecutor then argued that "one of those two witnesses is not telling the truth." Alcantara contends that this last statement amounted to misconduct.

Because it was reasonable to infer from the evidence that either Agent Hunter or Alcantara was lying, the challenged statement was not plainly improper. Prosecutors must generally avoid statements "to the effect that, if the defendant is innocent, government agents must be lying." *Sanchez*, 176 F.3d at 1224 (internal quotation marks omitted). However, the government must be given reasonable latitude in closing argument, and in "a case that essentially reduces to which of two conflicting stories is true, it may be reasonable to infer, and hence to argue, that one of [the] two sides is lying." *United States v. Wilkes*, 662 F.3d 524, 541 (9th Cir. 2011) (quoting *United States v. Molina*, 934 F.2d 1440, 1445 (9th Cir. 1991)). For example, the government is allowed to argue that "somebody is lying" when the government and defense witnesses present wholly incompatible testimony

regarding who initiated a drug transaction.  *Molina*, 934 F.2d at 1445; *see also Wilkes*, 662 F.3d at 541 (finding no impropriety in the government's argument that "[y]ou can't believe both" the defendant and prosecution witnesses).  This case similarly reduces to which of two conflicting accounts is true.  Agent Hunter's narrative and Alcantara's narrative cannot be reconciled, and "the inference is unavoidable" that one of them was lying.  *Molina*, 934 F.2d at 1445.

Nor did the prosecutor's vouching for Agent Hunter's credibility rise to the level of plain error when he later argued: "Agent Hunter's testimony remained consistent.  It remained believable, and it remained logical."   This ambiguous statement is reasonably understood in either of two ways: as an impermissible assertion of the prosecutor's personal opinion that Agent Hunter's testimony was consistent, believable, and logical; or as a permissible argument that the jury should find Agent Hunter's testimony consistent, believable, and logical.  We have held that a prosecutor's summary of what "we know" about the evidence does not constitute improper vouching when the surrounding context suggests that, despite the personal language, the prosecutor is drawing inferences from evidence in the record rather than offering an opinion.   *Younger*, 398 F.3d at 1190–91.  Here, when the statement is viewed in context, the prosecutor appears to be employing the language of the district court's jury instruction as to credibility to argue that the jury should believe Agent Hunter based upon inferences it could draw from the evidence.  The challenged statement was ambiguous, and it did not clearly "place[] the prestige of the government behind a witness through personal assurances of the witness's veracity."  *Id.* at 1190 (quoting *United States v. Leon-Reyes*, 177 F.3d 816, 822 (9th Cir. 1999)).   It therefore did not amount to plain error.

C.

The government concedes that it improperly vouched for Agent Hunter's credibility when it began its rebuttal argument by stating: "Ladies and gentlemen, this case boils down to the credibility of a 15-year methamphetamine addict, a man who has every incentive to lie, versus the testimony and the evidence of Border Patrol agents who are sworn to uphold the law." There was no evidence in the record that Border Patrol agents are "sworn to uphold the law." As the government appropriately concedes, the prosecutor vouched for Agent Hunter's credibility by referring to facts not before the jury to convince it in this credibility showdown that Agent Hunter was telling the truth, as he was sworn to do. *See, e.g.*, *Combs*, 379 F.3d at 574; *Sanchez*, 176 F.3d at 1224–25. We have previously made clear that a prosecutor may not argue that "the existence of legal and professional repercussions" for law enforcement officers serves to "ensure the credibility of the officers' testimony." *Weatherspoon*, 410 F.3d at 1146. That is precisely what the prosecutor did here.

**IV.**

While Alcantara timely objected to the prosecutor's improper rebuttal argument, and arguably timely objected to the prosecutor's improper cross-examination, we need not decide whether to apply harmless error analysis here. Even under the more restrictive plain error standard the combined misconduct requires reversal. *Id.* at 1151.

Under the plain error standard, where prosecutorial misconduct affects the defendant's substantial rights and seriously affects the fairness, integrity, or reputation of judicial proceedings, the misconduct is reversible error. *See*

*Combs*, 379 F.3d at 568.   To determine whether the misconduct affected the defendant's substantial rights, we "look to the substance of any curative instructions, and the strength of the case against the defendant absent the misconduct." *United States v. Sanchez*, 659 F.3d 1252, 1257 (9th Cir. 2011).  There is no bright-line rule for determining whether reversal is appropriate.  Rather, we may consider various relevant factors, including the form and timing of the misconduct, the extent to which the prosecutor asserted a personal opinion or implied extra-record knowledge, the importance of the testimony to which the improper conduct related, and the specificity and timing of any curative instruction.  *See Ruiz*, 710 F.3d at 1085.

We have repeatedly reversed convictions for plain error in cases in which "witness credibility was paramount" and the prosecutor sought to bolster critical testimony through improper conduct.  *Combs*, 379 F.3d at 573 (quoting *Geston*, 299 F.3d at 1137); *see also Weatherspoon*, 410 F.3d at 1151; *Kerr*, 981 F.2d at 1054.  There is no question that witness credibility was paramount in this case.  As the prosecutor himself stated: "Credibility. This case is largely going to come down to the issue of credibility."

This particular credibility contest was made even closer by the significant credibility problems of each of the contestants.  Alcantara's drugged memory was spotty and selective at best.  He remembered some highly specific details of his journey, such as the quantities of methamphetamine he purchased en route, and filling up a water bottle with dirty water near palm trees, while providing inconsistent testimony about his prior use of methamphetamine, among other subjects.  And Alcantara's four prior convictions for illegal reentry, which he

acknowledged during cross-examination, surely impaired his credibility.

On the other hand, Agent Hunter's testimony that Alcantara spontaneously confessed to having knowingly entered the United States was not particularly believable. Agent Hunter failed to make any contemporaneous record of Alcantara's alleged confession. The statements do not appear in either the Border Patrol's report or Agent Hunter's own "detailed" addendum. Nor did he tell anyone else about Alcantara's alleged statements for at least seven months thereafter. It was not until Agent Hunter met with the prosecutors in this case that he somehow managed to recall and report Alcantara's alleged spontaneous confession to the elements of a § 1326 violation. Moreover, Agent Hunter's testimony that Alcantara had water bottles and empty food containers in his backpack was vague, unconvincing, and substantially undermined on cross-examination. On cross, Agent Hunter admitted that he had not personally searched Alcantara's bag and was unable to recall the specific items it may have contained, contrary to his direct testimony. There was also no contemporaneous record or physical evidence of the bag's alleged contents.[3]

Although Alcantara was a poor witness, the defense at least provided some corroboration of the essential details of his exculpatory narrative. The El Hongo rehabilitation center

---

[3] During cross-examination of the defense's psychiatric expert, some mention was made of a hospital record that indicated Alcantara had food and water at some point. It was unclear who had provided this information or when Alcantara had either possessed or been given the food and water, and no mention was made of Alcantara's backpack. The record itself was not introduced into evidence.

and the abandoned railroad tunnel where Alcantara testified he used methamphetamine actually existed. Evidence showed a gap in the border fence near the location of Alcantara's arrest, which, Alcantara argued, allowed him to enter the United States easily. And a psychiatric expert provided unrebutted testimony that a habitual methamphetamine user could suffer hallucinations and disorientation as to time and place, especially if dehydrated and exposed to extreme heat. While this jury did not believe Alcantara, a jury in a trial unaffected by improper prosecutorial conduct reasonably could have believed him and concluded that he did not knowingly enter the United States—or at least that the government failed to prove beyond a reasonable doubt that he did so.

The government's conduct of the trial illuminates the closeness of the case and demonstrates that a conviction was far from assured. The more junior of the two U.S. attorneys handling the case, who was actually trying his first case, handled almost the entire trial. He gave the opening statement, examined Agent Hunter, cross-examined Alcantara, and offered the government's initial closing argument. Then the more senior prosecutor stood up to argue the government's rebuttal. After reintroducing himself to the jury, the senior prosecutor opened the rebuttal with the improper statement comparing "the credibility of a 15-year methamphetamine addict" to "the evidence of Border Patrol agents who are sworn to uphold the law."

The senior prosecutor had ample opportunity to consider how to proceed in rebuttal. He chose to begin his remarks with a comment that an experienced Assistant United States Attorney would surely know approached, if not exceeded, the bounds of propriety. That the supervising prosecutor at

trial—who, unlike us, actually observed the critical testimony
and the jury's response to the key witnesses—felt motivated
to take this risk suggests he may have had doubts about the
outcome. Indeed, this improper comment was not the only
way in which the senior prosecutor aggressively pushed the
limits of propriety in his rebuttal argument. The district court
sustained an objection to the prosecutor's misstatement of the
evidence, and then spontaneously chided him for "trying to
get around" the objection when he attempted to restate the
point obliquely. The district court also admonished the
prosecutor twice during his remarks for going beyond the
proper scope of rebuttal, and then again after the jury had
retired for "overd[oing] the true meaning of close by having
a second bite of the apple." That the government felt the
need to engage in these improper tactics only enforces just
how close the credibility contest was, further demonstrating
that the combined misconduct, the questioning about Agent
Hunter's veracity and the improper rebuttal, was highly
prejudicial.

Defense counsel did timely object to the senior
prosecutor's improper rebuttal argument, and the district
court sustained the objection and instructed the jury to
disregard the comment. We are not convinced, however, that
the trial court's instruction sufficiently cured the error. Our
cases concerning prosecutorial vouching often require more
than a quick statement that "the jury will disregard" the
vouching to neutralize any prejudice. *United States v.
Simtob*, 901 F.2d 799, 806 (9th Cir. 1990). In *Simtob*, for
instance, we found that the effect of vouching was not cured
even though the district court had instructed the jury to
disregard the comment and had provided relevant general jury
instructions on credibility. *Id.* In other cases, we have found
that "the manner in which [defense] objections were sustained

unfortunately did not deliver the required strong cautionary message," *Weatherspoon*, 410 F.3d at 1151, and we have suggested that a "strongly worded curative instruction" may be necessary to cure vouching, *Sanchez*, 659 F.3d at 1258. *See also Kerr*, 981 F.2d at 1053 (examining the *substance* of a curative instruction to determine whether vouching was prejudicial). Here, a firmer and more specific curative instruction would have been particularly appropriate. Because the government's rebuttal was the last thing the jury heard before beginning its deliberations, "the impact" of the misconduct was "likely to be significant." *Sanchez*, 659 F.3d at 1259.

For these reasons, we conclude that the errors at trial affected Alcantara's substantial rights. It was fundamentally unfair and prejudicial to Alcantara to compel him to impugn the veracity of Agent Hunter's critical, and possibly determinative, testimony. *Combs*, 379 F.3d at 573. This error was "compounded" by improper vouching that was not fully remedied by the district court's minimal curative instruction. *Id.* at 574. As the government itself argued, the jury was faced with a choice between believing Agent Hunter or believing Alcantara. Both witnesses' accounts of the events in question were profoundly flawed, and given the government's burden of proving guilt beyond a reasonable doubt, the jury plausibly could have acquitted Alcantara if the trial had been untainted by prosecutorial misconduct. In light of the senior prosecutor's conduct in rebuttal argument, we also conclude that the errors "seriously affect[ed] the fairness,

integrity, or public reputation of judicial proceedings." *Ruiz*, 710 F.3d at 1085 (quoting *Sanchez*, 659 F.3d at 1256).[4]

## V.

By asking Alcantara to comment on the credibility of the key witness against him, and then referring to evidence not before the jury to bolster that witness's testimony, the government crossed the fine line separating the vigorous pursuit of justice from the overzealous pursuit of victory. These improper tactics compromised the fairness of the trial. We reverse Alcantara's conviction and remand for further proceedings consistent with the demands of due process.

**REVERSED AND REMANDED.**

---

[4] Because we reverse on the basis of prosecutorial misconduct, we need not reach Alcantara's argument that the jury instructions misstated the law. We have, however, repeatedly upheld the use of the Ninth Circuit model jury instruction on reasonable doubt. *See, e.g.*, *United States v. Ruiz*, 462 F.3d 1082, 1087 (9th Cir. 2006); *United States v. Clayton*, 108 F.3d 1114, 1118 (9th Cir. 1997); *see also United States v. Meraz-Olivera*, 472 F. App'x 610, 612 (9th Cir. 2012) (rejecting the same arguments Alcantara makes here).

RAWLINSON, Circuit Judge, dissenting:

I respectfully dissent. Martin Alcantara-Castillo (Alcantara) challenges his conviction for being a deported alien found in the United States in violation of 8 U.S.C. § 1326. Alcantara contends that a new trial is warranted because the government improperly compelled Alcantara to challenge the veracity of a government witness during the government's cross-examination and impermissibly vouched for government witnesses during closing arguments. The majority agrees with Alcantara. I agree with the district court.

## I.  BACKGROUND

Alcantara was charged with one count of being a deported alien found in the United States in violation of 8 U.S.C. § 1326.

### A.  Trial Testimony

Border Patrol Agent Aaron Hunter testified that, on June 26, 2011, he was informed that a motion sensor had been triggered approximately seven miles east of the Tecate port of entry. Agent Hunter described the area as "very mountainous, rugged terrain" one mile north of the border.

According to Agent Hunter, he discovered Alcantara lying on the ground in the area, alongside a cargo container. When questioned in Spanish, Alcantara responded that he was a Mexican citizen and lacked any documents permitting him to be in the United States. Agent Hunter arrested Alcantara, who remained calm and submissive. Agent Hunter opined that, if Alcantara had been under the influence of

narcotics, Agent Hunter would have contacted the local police for safety reasons. Based on his training, Agent Hunter did not believe that Alcantara was under the influence of narcotics because Alcantara "seemed fully aware of the situation" and answered Agent Hunter's questions appropriately.

According to Agent Hunter, Alcantara spontaneously informed Agent Hunter that he was part of a group of aliens who had been chased by border patrol agents during the previous night and that he was attempting to return to Mexico.

During a subsequent search, border patrol agents other than Agent Hunter found a backpack with empty bottles and food containers, but no illegal narcotics or drug paraphernalia. Agent Hunter related that Alcantara also provided a false name to the agents.

On cross-examination, Agent Hunter acknowledged that the arrest report did not include Alcantara's statement that he had been separated from a group of aliens entering the United States. Agent Hunter also did not mention the statement to his fellow agent, or when he drafted an addendum to the report. Agent Hunter informed the government of Alcantara's statement when preparing for trial. Agent Hunter explained that the statement was not in the report or addendum because it was "not relevant to the arrest." Rather, the facts relevant to Alcantara's arrest were Alcantara's presence in the United States; his statement that he was a Mexican citizen; and the lack of documents permitting Alcantara to enter or remain in the United States.

Border Patrol Agent Luis Martinez testified that, on June 26, 2011, he interviewed Alcantara. Agent Martinez terminated the interview within one minute pursuant to Border Patrol policies because Alcantara stated that he was under the influence of methamphetamine. However, Agent Martinez related that, based on his training, there were no objective indications that Alcantara was under the influence of "any mind-altering substance."

According to Alcantara, he had been using methamphetamine almost daily since 1995. He decided to enter a rehabilitation clinic on June 24, 2011, the day before his arrest in the United States, because one of his friends had died of an overdose. Intending to enter a clinic near El Hongo, Mexico, he left on a bus to Tecate on June 25, but purchased methamphetamine prior to leaving. After arriving in Tecate, Alcantara intended to go to the home of a friend. However, Alcantara met two men along the way in a tunnel near a bridge and smoked methamphetamine with them, more methamphetamine than he had ever smoked before.

Alcantara did not remember leaving the tunnel, and awakened the next day on the side of the road, thinking he was on the road between Tecate and Mexicali. According to Alcantara, he was resting on a board next to a container when he was approached by an individual in a uniform. Alcantara informed the man in uniform that he was Mexican. Alcantara did not remember saying anything more to the man.

Alcantara acknowledged that he had been convicted of illegal reentry in 1995, 1997, 2002, and 2009. Alcantara also conceded that he had lied during a prior arrest when he stated that he had never used methamphetamine.

The prosecutor asked Alcantara if he remembered Agent Hunter's testimony from the previous day concerning statements made by Alcantara. Alcantara stated that he did not remember Agent Hunter's testimony. Alcantara also responded:

> Agent Hunter, he can say whatever he wants.
> He is saying I had a black sweater the day of
> my arrest, that I had food in my backpack, and
> there is nothing of that. That was all invented.
> All these things were invented.

The prosecutor subsequently inquired, "Your testimony is that Agent Hunter is inventing stories about you; is that correct?" When Alcantara responded, "[w]here are my things," the prosecutor asked, "do you remember him telling that story?" After overruling the defense's objection that the government was vouching for Agent Hunter, the district court stated there was "a confusion as to time. Did you hear the story the agent told yesterday?" Alcantara finally responded, "Yes, I did."

Dr. Clark Smith, a specialist in psychiatry and addiction psychiatry, testified that he interviewed Alcantara for three hours and determined that Alcantara was methamphetamine-dependent.

Lorena Garcia (Garcia), an investigator for the Federal Defenders of San Diego, traveled to Mexico and visited the rehabilitation clinic in El Hongo. Garcia related that the clinic went by the acronym "CRREAD" and that it was located to the east of Tecate. Garcia also located a tunnel "on the outskirts of Tecate . . ."

## B. Closing Arguments

During closing arguments, the prosecutor stated:

> Credibility.   This case is largely going to come down to the issue of credibility.  You have heard two versions of the facts in this case. Two witnesses: the defendant testifying that he didn't know what happened, that he was blacked out; and the prosecution's witness, Border Patrol Agent Aaron Hunter, who testified that the defendant calmly and coherently told him how he had knowingly entered the United States the day before, and proceeded north with a group that had been scouted by . . . border patrol agents on ATVs.

The prosecutor argued that the jury could not believe both Agent Hunter's testimony and Alcantara's testimony and "one of those two witnesses is not telling the truth." Relying on the credibility instruction provided by the district court,[1]

---

[1] The district court instructed the jury:

> In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe.  You may believe everything a witness says, or part of it, or none of it.  In considering the testimony of any witness, you may take into account: (1) the witness's opportunity and ability to see or hear or know the things testified to; (2) the witness's memory; (3) the witness's manner while testifying; (4) the witness's interest in the outcome of the case, if any; (5) the witness's bias or prejudice, if any; (6) whether other evidence contradicted the witness's testimony; (7) the reasonableness of the witness's

the prosecutor asserted that "Agent Hunter's testimony remained consistent.  It remained believable, and it remained logical."

The prosecutor emphasized that Alcantara remembered numerous events, such as smoking methamphetamine, resting at the container, and picking up a water bottle on the roadside, but was unable to remember key facts concerning his entry into the United States.  The prosecutor argued that Alcantara was not credible and had "every motive to lie . . ."

In rebuttal, the prosecutor reiterated that "this case boils down to the credibility of a 15-year methamphetamine addict, a man who has every incentive to lie, versus the testimony and the evidence of border patrol agents who are sworn to uphold the law."  The district court sustained the defense's objection and instructed the jury to disregard the government's comment.  However, the district court denied the defense's request for a curative instruction that "law enforcement officers are not entitled to any greater credibility as compared to any other witness. . . ."  The district court held that the jury had been thoroughly instructed on the credibility of witnesses and that a curative instruction was unwarranted in light of the district court's instruction for the jury to disregard the comment.

---

testimony in light of all the evidence; and (8) any other factors that bear on believability.  The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify.  What is important is how believable the witnesses were, and how much weight you think their testimony deserves.

## C.  Conviction and Sentence

The jury found Alcantara guilty and the district court sentenced Alcantara to forty months' imprisonment. Alcantara filed a timely notice of appeal.

## II.  STANDARDS OF REVIEW

"We review alleged vouching for harmless error when . . . the defendant objected at trial."  *United States v. Stinson*, 647 F.3d 1196, 1211 (9th Cir. 2011), *as amended* (citation omitted).  "We review for abuse of discretion a district court's rulings on alleged prosecutorial misconduct, including vouching."  *Id.* (citation omitted).  We review claims of misconduct for plain error when the defendant failed to object. *See United States v. Doss*, 630 F.3d 1181, 1193 (9th Cir. 2011), *as amended*.  Denial of a requested curative instruction is reviewed for abuse of discretion.  *See United States v. Skinner*, 667 F.2d 1306, 1310 (9th Cir. 1982).

## III.    DISCUSSION

## A.  The Prosecutor's Cross-Examination

Because Alcantara did not object to the cross-examination during trial, we review for plain error.  *See Doss*, 630 F.3d at 1193.  To be plain, an error must be so obvious that the judge should be able to detect the error even in the absence of an objection. *See United States v. Matus-Zayas*, 655 F.3d 1092, 1098 (9th Cir. 2011).  "Improper questioning was [not] an organizational theme for the prosecutor's entire cross-examination."  *United States v. Harrison*, 585 F.3d 1155, 1159 (9th Cir. 2009), *as amended*.  Rather, Alcantara spontaneously challenged Agent Hunter's testimony when the

prosecutor merely inquired whether Alcantara remembered that testimony. The prosecutor followed up by inquiring if it was Alcantara's "testimony . . . that Agent Hunter [was] inventing stories about [him]." The prosecutor did not otherwise compel Alcantara to comment on Agent Hunter's veracity. *Cf. United States v. Geston*, 299 F.3d 1130, 1135 (9th Cir. 2002) (asking five times whether the government witness "would be lying" if his testimony contradicted that of the witness).

The crucial distinction between this case and the cases cited in the majority opinion is the absence of the word "lying" in the questions posed by the prosecutor in this case. Use of that word appears to be the common denominator in those cases holding that plain error occurred. *See, e.g.*, *Geston*, 299 F.3d at 1134 (asking if the government witness "would be *lying*"); *United States v. Combs*, 379 F.3d 564, 572 (9th Cir. 2004) (questioning whether agent "was *lying*" in his earlier testimony); *Harrison*, 585 F.3d at 1158 (inquiring if witnesses were "swearing on oath to testify to the truth and then *lying*"); *United States v. Sanchez*, 176 F.3d 1214, 1220 (9th Cir. 1999) (asking if the witness "would say [another witness] was *lying*" when he testified); *United States v. Moreland*, 622 F.3d 1147, 1159 (9th Cir. 2010) ("You heard his testimony. . . . He's *lying*?") (emphases added).

The majority seeks to lessen the precedential effect of these cases by resorting to dictionary definitions. *See Majority Opinion*, p. 12–13. Yet, we resort to dictionary definitions only when the meaning of language in a statute is unclear, not to reword our precedent. *See, e.g.*, *San Jose Christian College v. City of Morgan Hill*, 360 F.3d 1024, 1035 (9th Cir. 2004) ("To determine the plain meaning of a term undefined by a statute, resort to a dictionary is

permissible . . .") (citation omitted). The fact remains that the majority has cited no case where prosecutorial misconduct was found based on an inquiry regarding "invention" of testimony, particularly when that characterization was first used by the testifying defendant. Without clear precedent on this issue, it cannot be fairly said that the district court plainly erred.

Indeed, the majority has not cited one case where there was a determination of plain error in the absence of use of the word "lying" or some variant of "lie." Yet, there are cases in our precedent concluding that there was no plain error when the prosecutor was accused of forcing the witness to comment on veracity, but stopped short of using the L-word. *See, e.g.*, *United States v. Greer*, 640 F.3d 1011, 1023 (9th Cir. 2011) (observing that "[a]lthough we have repeatedly stated that a prosecutor may not ask the defendant to comment on the veracity of another witness, we have found improper prosecutorial questioning in only one particular context: when the prosecutor specifically asked the defendant whether another witness was *lying*") (citing *Harrison*, *Combs*, *Geston* and *Sanchez*).

The majority argues that my reliance on *Greer* is misplaced. *See Majority Opinion*, p. 13. I beg to differ. *Greer* states definitively the point that makes plain error inapplicable to this case—"we have found improper prosecutorial questioning in only one particular context: when the prosecutor specifically asked the defendant whether another witness was *lying*." 640 F.3d at 1023 (citations omitted) (emphasis in the original). We declined to conclude that there was plain error when the prosecutor asked whether another witness testified "inaccurately" because neither the Supreme Court nor our court had yet ruled on whether asking

about "inaccurate" testimony was improper. *Id*. Similarly, neither the Supreme Court nor this court has ruled that asking about "invented" testimony is improper, particularly when the term is first used by the testifying defendant. Notably, this case cites the exact cases cited by the majority, but acknowledges that these cases concluding that questioning was improper are limited to "one particular context: when the prosecutor specifically asked the defendant whether another witness was *lying*. . . ." *Id*. (emphasis in the original); *see also United States v. Wright*, 625 F.3d 583, 612 (9th Cir. 2010) (holding that there was no plain error when the prosecutor asked the defendant questions concerning a "rogue agent" during "a fairly argumentative cross-examination in order to poke holes in [the defendant's] version of the facts").

The facts of this case diverge substantially from those relied upon by the majority. An initial and important difference is that the first comment on the veracity of Agent Hunter's testimony came unprompted from Alcantara when he stated that Agent Hunter had "invented things" about Alcantara. Unlike in the cases where plain error occurred, the prosecutor did not follow up by asking Alcantara if Agent Hunter was lying when he testified. Rather, he used the same word utilized by Alcantara to ask Alcantara: "Your testimony is that Agent Hunter is inventing stories about you; is that correct?"

There was nothing inappropriate about the prosecutor asking Alcantara if he heard Agent Hunter's testimony, and the majority has cited no authority otherwise. *Cf. Hoxsie v. Kerby*, 108 F.3d 1239, 1244 (10th Cir. 1997) (rejecting a claim of prosecutor misconduct where the attorney asked the defendant if he had heard the testimony); *see also Wright*, 625 F.3d at 612 ("There was nothing improper about the

prosecutor's" questions forcing the defendant to call the investigating agent a "rogue agent").

The majority intimates that its holding of plain error is valid because the prosecutor "forced" Alcantara to comment on Agent Hunter's truthfulness. *Majority Opinion*, pp. 14–15. However, this contention lacks persuasive force because we have expressly held that no plain error occurred during a "fairly argumentative cross-examination" that forced a defendant to call an agent a "rogue agent." *See Wright*, 625 F.3d at 612.

Finally, even if it was error for the district court to allow the prosecutor to follow-up on Alcantara's comment that Agent Hunter "made up things," "the error was not so clear-cut, so obvious, a competent district judge should have been able to avoid it without benefit of objection. . . ." *Greer*, 640 F.3d at 1023 (citation, alterations and internal quotation marks omitted). In *Greer*, we concluded that "[b]ecause neither the Supreme Court nor this court has yet ruled on the propriety of the prosecutor's questions in this case [whether witnesses testified inaccurately], the district court did not err." *Id*. The same is true in this case. As mentioned, we have limited our cases involving plain error to those where a witness is asked if another witness is *lying*. *See id*. Neither the United States Supreme Court nor this court has gone further to impute plain error when the prosecutor asks if another witness "made up things," especially when the defendant used the phrase first and the prosecutor merely repeated the phrase in the form of a question. Because the facts in this case differ so dramatically from those where plain error occurred, I would hold that the trial judge was not obligated to *sua sponte* object to the prosecutor's questions to *Alcantara*. *See Matus-Zayas*, 655 F.3d at 1098.

## B.  The Prosecutor's Closing Arguments

"Improper vouching consists of placing the prestige of the government behind a witness through personal assurances of the witness's veracity, or suggesting that information not presented to the jury supports the witness's testimony. . . ." *United States v. Ruiz*, 710 F.3d 1077, 1085 (9th Cir. 2013) (citation and internal quotation marks omitted). "[C]redibility is a matter to be decided by the jury." *Id.* at 1082 (citation omitted). "To that end, prosecutors have been admonished time and again to avoid statements to the effect that, if the defendant is innocent, government agents must be lying." *Id.* at 1082–83 (citation and internal quotation marks omitted). "It is also true, however, that the prosecution must have reasonable latitude to fashion closing arguments. Inherent in this latitude is the freedom to argue reasonable inferences based on the evidence. In a case that essentially reduces to which of two conflicting stories is true, it may be reasonable to infer, and hence to argue, that one of the two sides is lying." *Id.* (citations omitted).

Reversal of Alcantara's conviction based on the prosecutor's closing arguments is not warranted given Alcantara's credibility problems and the evidence presented at trial. Alcantara was found in the United States in an area described as "very mountainous, rugged terrain" north of the United States-Mexico border. The government presented photographs to the jury evincing the rugged and mountainous terrain through which Alcantara maintained that he blindly and unconsciously wandered as he was under the influence of methamphetamine. Despite Alcantara's contention that he was engaged in methamphetamine-induced wandering, Agent Hunter testified that border patrol agents found empty food containers and bottles in Alcantara's backpack and that

Alcantara did not appear to be under the influence of narcotics. Alcantara's alleged statement to Agent Hunter that Alcantara was separated from a group of aliens traveling to the United States after being dispersed by border patrol agents was consistent with Agent Joseph Moore's testimony concerning similar events that occurred that evening.

Alcantara also suffered from an extensively selective memory. He testified in great detail about his decision to enter a rehabilitation clinic on the day before his arrest; the one thousand pesos he won at a casino "on Revolucion and Third Street" after purchasing a fifty-peso ticket he used to buy six balloons of methamphetamine on the night before making his decision to seek rehabilitation; his purchase of five bags of methamphetamine at the Hotel Nizan on the same evening; his bus trip at five o'clock in the morning on June 25th to Tecate; his purchase of two bags of methamphetamine immediately before his bus trip; his arrival in Tecate at eight o'clock in the morning; his cab ride to "the Andalucia neighborhood" to meet a friend, Juan, who had a small home near Tecate with sheep; his consumption of two balloons of methamphetamine with two men in a tunnel near a bridge and railroad tracks; and his subsequent methamphetamine purchase for seven hundred pesos. After waking up the next day in the United States, Alcantara remembered seeing "a small little farm that had some palm trees"; picking up a water bottle from the side of the road; cleaning a board on the ground next to a container so that he could rest; being approached by an individual "dressed in green"; asking Agent Hunter for water because Alcantara had filled his water bottle "over . . . where the palm trees were at, and the water was dirty"; and picking up a water bottle as he was walking with Agent Hunter.

Despite Alcantara's detailed recollection of the former events, Alcantara did not remember traveling through a rugged and mountainous area into the United States, any statement to Agent Hunter about his entry into the United States, or even Agent Hunter's trial testimony from the day before until finally answering the district court's question.

Moreover, Alcantara's credibility was severely undermined by his admissions that he had been convicted of illegal reentry in 1995, 1997, 2002, and 2009. Notably, Alcantara was arrested for illegal reentry on two occasions after traveling into the United States from Tecate. Alcantara also conceded that he lied during a prior arrest when he falsely stated that he had never used methamphetamine.

Although the prosecutor did improperly vouch for government witnesses by mentioning during rebuttal argument that the border patrol agents were "sworn to uphold the law," the district court immediately sustained the defense attorney's objection, and instructed the jury to disregard the comment, rendering any error harmless. *See United States v. Parks*, 285 F.3d 1133, 1141 (9th Cir. 2002) (holding that improper statement was rendered harmless because the district court "sustained [the defendant's] objection . . . and admonished the jury to disregard the statement"). The district court did not abuse its discretion in denying Alcantara's request for a curative instruction, as the district court properly held that the jury had been fully instructed concerning the credibility of government witnesses, and its prompt instruction to disregard the isolated comment sufficiently remedied any error. *See United States v. Dorsey*, 677 F.3d 944, 955 (9th Cir. 2012) (holding that the district court's swift response instructing the jury to disregard the improper comment "prevented . . . [the] improper comment from

materially affecting the verdict") (citation omitted); *see also United States v. Washington*, 462 F.3d 1124, 1136 (9th Cir. 2006) ("A judge's prompt corrective action in response to improper comments usually is sufficient to cure any problems arising from such improper comments. . . .") (citations omitted).

Considering Alcantara's significant credibility problems, the evidence presented at trial of his illegal presences in the United States, and the curative instruction given by the trial judge, Alcantara failed to demonstrate that "in the context of the entire trial, it is more probable than not that [the prosecutor's comment] materially affected the verdict. . . ." *Dorsey*, 677 F.3d at 954 (citation and internal quotation marks omitted). Stated another way, any error in vouching for the witnesses was harmless. *See id.* at 955. Finally, there was no abuse of discretion in denying the requested curative instruction. *See Skinner*, 667 F.2d at 1310 (recognizing that use of curative or limiting instructions is within the district court's discretion).

Our decision in *United States v. Weatherspoon*, 410 F.3d 1142 (9th Cir. 2005), does not compel a contrary result. In that case, the prosecutor extensively vouched for government witnesses. The prosecutor started out by describing a police witness as "a credible officer." *Id*. at 1146. Despite being instructed not to vouch, the prosecutor went on to argue that the police officers

> had no reason to come in here and not tell you the truth. I guess, if you believe . . . defense counsel, they must have lied at the scene there; they came into this court and they lied to you; they lied to this judge; they lied to me;

they lied to my agent . . . I guess they lied to
the dispatcher when they called it in. These
are officers that risk losin' [sic] their jobs, risk
losin' [sic] their pension, risk losin' [sic] their
livelihood. And, on top of that if they come in
here and lie, I guess they're riskin' bein' [sic]
prosecuted for perjury. . . .

*Id.*

The prosecutor used the "they lied" refrain six
consecutive times, and told the jury that the officers risked
losing their jobs, losing their pensions, losing their livelihood,
and being prosecuted for perjury. *Id.* In contrast, the
prosecutor in this case simply stated once that the agent was
sworn to uphold the law. Unlike in *Weatherspoon*, *see id.*,
the prosecutor in this case did not continue to vouch for the
agent after the court sustained the defense objection.
Moreover, unlike in *Weatherspoon*, *see id.*, the court in this
case gave a curative instruction. The two cases are so
different that *Weatherspoon* does not dictate the result in this
case. In *Weatherspoon*, we held that reversal of the
defendant's conviction was warranted because the district
court's approach

did not produce any meaningful alteration of
the prosecutor's arguments, and the manner in
which such objections were sustained
unfortunately did not deliver the required
strong cautionary message . . .

*Id.* at 1151. We opined that

> [s]uch failures to correct the improper statements at the time they were made cannot be salvaged by the later generalized jury instruction reminding jurors that a lawyer's statements during closing argument do not constitute evidence.  In short, the curative instructions offered . . . did not neutralize the harm of the improper statements because they did not mention the specific statements of the prosecutor and were not given immediately after the damage was done.

*Id.* (citations, alteration, and internal quotation marks omitted).  The district court in this case immediately sustained the defense's objection and instructed the jury to disregard the isolated comment.  Unlike in *Weatherspoon*, Alcantara does not contend that the government continued to improperly vouch for government witnesses after the district court's ruling.  *See Dorsey*, 677 F.3d at 955 (noting that the judge's curative action prevented any improper comment from "materially affecting the verdict"); *see also Parks*, 258 F.3d at 1141 (same).

## IV.    CONCLUSION

The prosecutor's isolated question in response to Alcantara's spontaneous challenge to Agent Hunter's veracity during extensive cross-examination does not rise to the level of plain error as reflected in our precedent.

The district court did not abuse its discretion in denying a curative instruction during the prosecutor's rebuttal argument, as it granted Alcantara's motion to strike and instructed the jury to disregard the prosecutor's comment that

the border patrol agents were "sworn to uphold the law." Any prejudice stemming from the government's comment was cured by the district court's instruction and no additional curative instruction was required. In any event, in the context of the entire trial, it is highly unlikely that the prosecutor's comment materially affected the verdict.

There is no such thing as a perfect trial, and district court judges are not held to that standard. *See Brown v. United States*, 411 U.S. 223, 231–32 (1973). Considering the trial in its entirety, the proceedings were fundamentally fair, and on that basis we should affirm this conviction. *See id.*; *see also United States v. Del Toro-Barboza*, 673 F.3d 1136, 1150 (9th Cir. 2012).